Filed 4/25/13  P. v. Khek CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036185 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC779763) |
| v. | |
| KOSAL KIM KHEK et al., | |
| Defendants and Appellants. | |

A jury convicted defendants Kosal Kim Khek and Christopher Lee of first degree murder and found true criminal-street-gang allegations and, as to Khek, a personal-use-of-deadly-weapon allegation, for purposes of sentence enhancements.[1]  The trial court sentenced Khek to 26 years to life and Lee to 32 years to life.  On appeal, defendants contend that (1) the trial court erred by denying their motions to suppress evidence seized from their homes without a warrant, (2) the trial court abused its discretion by admitting a gruesome photograph of the murder victim, (3) the trial court abused its discretion by excluding from evidence Robert DeJong's police statements to the effect that the perpetrators intended only to hurt or injure the victim,[2] (4) the trial court erred by denying

_____

[1] Lee also pleaded guilty to assault with a firearm (and admitted personal-use-of-firearm and infliction-of-great-bodily-injury allegations) and willful discharge of a firearm from a vehicle at a person not the occupant (and admitted an infliction-of-great-bodily-injury allegation).

[2] DeJong had been a codefendant in this case, but had pleaded guilty to second degree murder before trial.

their motions for mistrial grounded on jury misconduct, and (5) the abstract of judgment erroneously fails to denote that the imposed restitution fines are joint and several. Khek additionally contends that the trial court erred by admitting into evidence DeJong's police statements to the effect that DeJong drove to the murder scene. Lee additionally contends that the trial court erred by (1) instructing the jury in the language of CALCRIM No. 400 (aider and abettor is equally guilty with perpetrator), and (2) failing to instruct the jury sua sponte on the lesser included offenses of voluntary and involuntary manslaughter. We agree that Khek's abstract does not conform to the judgment. But we otherwise disagree with defendants. We therefore affirm the judgment and modify Khek's abstract to conform to the judgment.

BACKGROUND

Viet Society (VS) and Strictly Family (SF) are rival criminal street gangs in San Jose. Defendants are VS members.

On August 29, 2007, SF gang members drove to and stopped at the Magic Sands Mobile Home Park where several of defendants' friends were sitting on the grass near a swimming pool. One of the friends, Tuan Nguyen, began arguing with a passenger in the SF car, and the passenger pulled out a gun and shot Nguyen three times. Another of the friends recognized the shooter and identified him to the police. Another friend described the car and a partial license plate number to the police. The police arrested the shooter and owner of the car for attempted murder.

When defendants found out about the shooting, they began to plot revenge against SF via computer instant messaging. For example, Lee told Khek that he was going to find out where the shooter lived and added: "Oh yeah. I found out that this Anthony [Nguyen] kid from Andrew Hill [High School] lives with Johnny. . . . [¶] . . . [¶] . . . We start by taking them out one by one. [¶] . . . [¶] . . . Just hit them up. Let's kill this Anthony kid from A Hill. He's a kid, too, just like Tuan. Eye for an eye." And Khek told Lee: "How does that Anthony kid look like? I am going to fuck his ass up. [¶] . . .

2

[¶] And run away like an assassin. [¶] . . . [¶] And he won't know who hit him." Lee later sent pictures of Anthony Nguyen to Khek, and Khek told Lee that "I'm going to get him after school so maybe at 3:00."

On September 6, 2007, Anthony Nguyen, Phong Nguyen, Kim Huynk, Lily Phong, and Kevin Huynh were smoking and talking outside a laundromat and the Q-Cup café. Khek walked up to Anthony Nguyen and asked whether he was Anthony. When Anthony Nguyen affirmed that he was Anthony, Khek stabbed him twice and ran away. Anthony Nguyen died at the scene from massive bleeding. One of the stab wounds penetrated his shoulder; the other wound penetrated his stomach four and a half inches, cut through the liver and aorta, and caused six to 12 inches of bowel to protrude from the body. Phong Nguyen and Kim Huynk identified Khek to the police. Police obtained an arrest warrant for Khek, determined that he was on probation with a search condition, arrested him at his apartment, and seized his computer. A witness linked Anthony Nguyen to Lee, and the police determined that Lee was on juvenile probation with a search condition. The police went to Lee's residence, conducted a probation search, and seized Lee's computer.

## MOTIONS TO SUPPRESS

Defendants contend that the trial court erred by denying their motions to suppress the evidence seized from their homes. They argue that the "police lacked knowledge of the terms of the search conditions upon which the authority to search was asserted." According to defendants, "an officer's bare knowledge that there is a search condition without specific knowledge of its terms, and, therefore, limitations" does not permit a general search. There is no merit to this contention.

"[U]nder California law, a search conducted pursuant to a known probation search condition, even if conducted without reasonable suspicion of criminal activity, does not violate the Fourth Amendment as long as the search is not undertaken for harassment or

3

for arbitrary or capricious reasons or in an unreasonable manner." (*People v. Medina* (2007) 158 Cal.App.4th 1571, 1577.)

There is no authority for defendants' proposition that a search conducted pursuant to a known search condition is unlawful without the additional requirement that the searching officers know the specific terms and limitations of the search condition. Defendants do not argue that the searches in this case exceeded the search conditions' limitations.

<u>ADMISSION OF MURDER VICTIM PHOTOGRAPH</u>

Defendants contend that the trial court abused its discretion by admitting a photograph "showing the abdomen and the extrusion of the intestines over [their] objection[s]" grounded on Evidence Code section 352 and due process principles. Defendants fail to carry their appellate burden.

Defendants objected to several photographs of the victim proffered by the People arguing that they were "particularly gruesome" and "offensive." Ultimately, the trial court admitted one photograph taken at the scene of the crime. It explained: "The photographs that depict the condition of the victim at the time he was first contacted by paramedics and thereafter at the coroner's office insofar as they show the intestines. There is no question that they are gruesome photos; that's a fact. There is no question that they accurately represent what the scene was. And they are relevant. The question is evaluating the gruesome nature of them to the probative value of them. And the photographs are relevant on issues of intent, malice, premeditation, and deliberation. They can be described verbally, but certainly pictures express the scene in a different way than words do. Having said that, the Court is not prepared to exclude all of those but the Court is not prepared to admit all the photos either. The Court believes and the Court has identified in its mind from this offered packet a photograph that would meet those needs, and it would appear to be to the Court under 352 to balance in favor of being admitted. Having done that, the Court is satisfied that the additional photos the cumulative value of

4

those photos or prejudice as it were outweighs the probative value, and that the other independent bases for leaving those photos would be admissible pale in regards to the prejudice of the cumulative value of the photographs. And that wasn't stated very artfully but ultimately in weighing its discretion under 352 the Court is going to permit the People to use photograph 615619. The Court is satisfied that that photograph represents the condition of the victim at the time paramedics were treating him at the scene, shows the what will be described I guess as the results of the abdominal wound."

Defendants simply reargue their trial court position that the photograph was irrelevant and, in any event, more prejudicial than probative. They fail to explain, however, the manner in which the trial court's decision was beyond reason. (*People v. Osband* (1996) 13 Cal.4th 622, 666 [abuse of discretion may be found when the trial court's ruling falls outside the bounds of reason].) In any event, defendants could not successfully make such an argument.

Appellate courts are " 'often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant' " [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative [citation]. A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282; accord, *People v. Hinton* (2006) 37 Cal.4th 839, 896.) The discretion applies equally to a photograph, which may be admitted as "pertinent because it showed the 'nature and placement of the fatal wounds' . . . [or] supported the prosecution's theory of how the murders were committed [citation] [or] illustrated the testimony of the coroner and percipient witnesses." (*People v. Loker* (2008) 44 Cal.4th 691, 705.)

Here, the trial court could have rationally concluded that the photograph was highly relevant. The photograph showed the nature and brutality of the wounds, which illustrated the People's theory that the killing was intentional rather than an assault gone awry and the pathologist's testimony about the severity of the injuries. "The challenged photograph[] simply showed what had been done to the victim; the revulsion [it] induced is attributable to the acts done, not to the photograph[]." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1054.) And the photograph was not "somehow rendered irrelevant simply because [the] defendant did not dispute the cause of death or the nature and extent of the victim's injuries." (*People v. Heard* (2003) 31 Cal.4th 946, 975.)

Even assuming that the photograph simply corroborated witness testimony as to how the murder occurred, this does not establish that the trial court abused its broad discretion in admitting the photograph into evidence. " '[P]rosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 713.) The People are entitled to prove their case and need not " 'accept antiseptic stipulations in lieu of photographic evidence.' [Quoting *People v. Pride* (1992) 3 Cal.4th 195, 243.]" (*People v. Loker*, *supra*, 44 Cal.4th at p. 705.) "Autopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes." (*People v. Howard* (2010) 51 Cal.4th 15, 33.)

We cannot conclude the prejudicial effect of the photograph so clearly outweighed its probative value to render the trial court's ruling an abuse of discretion.

### EXCLUSION OF DEJONG'S STATEMENTS OF INTENT

Defendants unsuccessfully sought to admit certain statements, which DeJong made to the police, under the declaration-against-interest exception to the hearsay rule.

6

(Evid. Code, § 1230 ["Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible . . . if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."].)  They argue that the trial court abused its discretion.  They fail to carry their burden to so demonstrate.

In order for a statement to be admissible as a declaration against penal interest, " '[t]he proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." '  [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration.  [Citations.]  In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Geier* (2007) 41 Cal.4th 555, 584 (*Grier*).)

Because of concerns that declarations against penal interest may contain self-serving and unreliable information, the exception generally does not "apply to collateral assertions within declarations against penal interest." (*People v. Campa* (1984) 36 Cal.3d 870, 882.)  Further, "[e]ven a hearsay statement that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect.  [Citation.]  Ultimately, . . . 'whether a statement is self-inculpatory or not can only be determined by viewing it in context.' " (*People v. Duarte* (2000) 24 Cal.4th 603, 612 (*Duarte*).)  Only those portions of the declaration that are "specifically disserving" to

7

the declarant's penal interests are admissible under Evidence Code section 1230. (*People v. Leach* (1975) 15 Cal.3d 419, 441.)

"Courts applying [Evidence Code] section 1230 to determine the basic trustworthiness of a proffered declaration are . . . to 'consider all the surrounding circumstances to determine if a reasonable person in [the declarant's] position would have made the statements if they weren't true.' " (*Duarte*, *supra*, 24 Cal.4th at p. 618.) In general, the least trustworthy statements are made to the police in order to deflect criminal responsibility onto others and the most trustworthy occur in noncoercive and uninhibited settings. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.) Generally, when an inculpatory statement is combined with self-serving exculpatory assertions, the exculpatory assertions will be considered untrustworthy and inadmissible. (*Duarte*, *supra*, at p. 612.)

We review a trial court's determination under Evidence Code section 1230 for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 536.) Thus, the trial court's decision " ' "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Geier*, *supra*, 41 Cal.4th at p. 585.) This rule requires that the reviewing court engage in all intendments and presumptions in support of the decision and consider the evidence in a light most favorable to the prevailing party. (*People v. Condley* (1977) 69 Cal.App.3d 999, 1015.) It also requires that the party claiming abuse of discretion affirmatively establish the point. (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

DeJong first told the police that he had been sleeping at his home at the time of the murder. He then told them that he had left home near the time of the murder to deliver a friend's backpack to school. Later in the interview, he denied ever going to the Q-Cup café and offered that he had learned of a killing at the Q-Cup from his girlfriend. After taking a break, the police told DeJong that they were investigating Anthony Nguyen's

murder at the Q-Cup; did not believe DeJong; and wanted to hear the truth from DeJong. DeJong then admitted that he went to the Q-Cup after dropping off the backpack. Before continuing, the officers revealed that they knew what had happened and cautioned DeJong against lying. DeJong then admitted being at the Q-Cup with Khek.

Defendants proffered the following statements from the interview for admission into evidence.

1. "We were driving to Q-Cup. We weren't planning it--this--there wasn't any plan it was just supposed to be, you know. We weren't--we weren't about to do it--or he wasn't--but then. . . ."

2. "And we walked back close to my car and we didn't know if we should do it . . . and then, fuck, I don't know, I took him back home to his house."

3. [Question: What was the plan? How were you going to hurt him?] "Either jump him and if you were gonna use a weapon, use, not that, not too muc[h] 'cause we didn't want him to die. Just stab him once, twice middle of the stomach and that was it. But I guess he got him in the neck too."

4. "Go to his house, stab him, and walk--walks away. [¶] . . . [¶] That was plan 2."

5. [Question: Who came up with the stabbing plan, you, [Vinh] Ly, and Khek. How 'bout [Lee]?] "No, he wasn't--he wasn't in [the car]."

6. [Dialogue to the effect that DeJong, Khek, and Ly drove back to Khek's home and Lee was already there harboring the belief that the plan had been to jump Anthony Nguyen.]

According to defendants, the statements involved DeJong in a plan to assault Anthony Nguyen and, as such, were against his penal interests. The People countered that the statements were exculpatory rather than incriminatory and, in any event, untrustworthy.

The trial court ruled that the statements were inadmissible and explained as follows.

"Well, and I guess that's where I have to look at the total picture. And the cases on declarations against penal interest focus on a couple of main points. Number one, not that the Court has to make a finding of truth but reliability, trustworthiness is the fulcrum of the exception to the hearsay rule. That is that the statement must be contrary to the declarant's interest such as it's reasonable to infer that the declarant wouldn't make it unless it was true, that is had some--some foundation there. And the cases are clear that the Court has to consider the statements in the total context of them. And the Court has to look at the motive for the statement. That a statement on its face though legally incriminatory may really seek to minimize or exculpate the declarant. If so then that becomes a struggle for its reliability. This is one exception as it were where we don't look at it by an objectively reasonable standard. You really have to look at the guts of the subjective motive of the declarant because that is part of what guides us. And to the extent it's partially incriminatory/partially exculpatory then it can and may be redacted if that works. But trustworthiness is what it's all about. Certainly one statement can be inculpatory in one context and exculpatory in another. To the extent a statement tell us-- you know, tell us about this case and the declarant lays out in clear form from start to finish a plan. So, for instance, if Mr. DeJong at the front end had, you know, the cop said we're investigating this death, we think you know something, tell us what happens. And he goes--lays out a whole scenario exactly as he laid out at the end, one could certainly argue that that's incriminatory. Incriminatory is not whether the words stated can be used against him. It is that the declarant believes it's against his interest to say what he's saying. And to the extent what the Court struggles with here is Mr. DeJong having said I had . . . nothing to do with it, then having been confronted as it were and then says okay, okay, you got me, I was there, I thought they were going to do this, I thought this was going to happen, this is what the plan is--those words while legally arguably

10

incriminatory to the sense that they can be used against him, and clearly were considered against him in the decision to file charges against him, if they are minimizing the involvement, if they are minimizing the offense, you're right, he doesn't have to say, gee whiz, you know, we're not guilty of murder, we're only guilty of manslaughter. But if what he is saying is, hey, yeah, I was there but we didn't plan this, this is not what was expected, what was planned was that he be stabbed in the stomach, that he would be assaulted, that he would be, you know, that we'd get back that way--is that minimizing? Absolutely. Is that arguably exculpatory? Absolutely. Is it incriminatory to the extent it is evidence from which one can find his guilt? Absolutely. So there's no question as you described sure it's incriminatory of a 245, if it's not believed it's incriminatory of a lot more than that. But the guts of it is that it is being believed, that it is trustworthy as an accurate statement of what occurred, that it is reliable; and in its reliable trustworthy form when looked at in the total context those portions of the statements that suggest the plan was significantly different than being argued by the People--it is exculpatory."

Here, there is no dispute that DeJong was unavailable as a witness at trial. He was sworn as a witness and refused to testify on the ground of self-incrimination. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607 [a declarant who claims the Fifth Amendment right to be silent is unavailable within the meaning of Evid. Code, § 1230].)

Thus, the issue before the trial court was whether the statements at issue were against DeJong's penal interests when made and trustworthy. As is apparent from the trial court's explanation, these two factors are inherently entwined and, most importantly for purposes of appellate review, subjective. Thus, defendants' arguments, which essentially urge that the trial court "did not arrive at the correct result," fail to carry their appellate burden to affirmatively demonstrate trial court irrationality from the evidence favorable to the trial court's ruling.

Here, the trial court could have rationally concluded that DeJong's statements were exculpatory or self-serving and untrustworthy because DeJong lied to the police

11

and, when caught in the lie, sought to minimize his culpability by posing an assault-gone-awry scenario. The court in *Duarte* held that the trial court had erred by admitting into evidence statements to the police similar to those at issue.

In *Duarte*, the defendant and another man were charged with shooting at a dwelling. Before trial, the defendant's accomplice gave the police a statement acknowledging participation in the crime, but minimizing his role. A redacted version of the statement was admitted at the defendant's trial as an admission against penal interest. *Duarte* explained that "a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' " (*Duarte*, *supra*, 24 Cal.4th at p. 612, quoting *In re Larry C.* (1982) 134 Cal.App.3d 62, 69.) Applying this rule, *Duarte* concluded the redacted statement, viewed in context, was self-serving and thus should have been excluded from evidence. (*Duarte*, *supra*, at pp. 612-613.)

Here, the trial court's lengthy analysis demonstrates that it exercised its discretion in a manner that was entirely consistent with the case law for determining the declaration-against-interest exception to the hearsay rule articulated in Evidence Code section 1230. Defendants' argument that "DeJong's statements were properly admissible" is no more than a disagreement with the evidence supporting the trial court's subjective evaluation of the proffered evidence. In short, defendants fail to carry their appellate burden to demonstrate an abuse of discretion.

Defendants' claims of constitutional error are also without merit. In general, application of the ordinary rules of evidence do not impermissibly infringe on a defendant's right to present a defense. (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627.) Here, because the trial court found that the hearsay, even if subject to an exception, was unreliable, excluding it did not violate defendants' right to present a defense. Defendants also suffered no denial of due process. Their citation to *Chambers v.*

12

*Mississippi* (1973) 410 U.S. 284, is erroneous.  There, the court overturned a state court's application of its hearsay rule because it excluded evidence made under circumstances that provided considerable assurance of the evidence's reliability.  (*Id*. at pp. 298-302.)  Here, defendants cannot complain of a denial of due process because the hearsay evidence they sought to introduce was unreliable.

Defendants alternatively urge that the trial court abused its discretion by excluding evidence of DeJong's statements of intent because it admitted DeJong's inculpatory police statements requested by the People.  We will address the point in the context of Khek's claim of error concerning the admission of DeJong's inculpatory police statements.

ADMISSION OF DEJONG'S INCULPATORY STATEMENTS

As part of its examination of DeJong's entire police statement, the trial court indicated that certain statements favoring the People's case were admissible as declarations against interest.  The parties therefore agreed to have the evidence admitted via stipulation, subject to Khek's objections that the statements transgressed "Khek's Sixth Amendment rights" and did not "represent the totality of what [DeJong] said."  Pursuant to the agreement, the parties arrived at a stipulation, which eliminated from DeJong's statements any references to Khek such as, "I went to [Khek's] house.  It was me and [Khek]," "We were driving to Q-Cup," "We drove back around and we saw him," "then he ran out of the car," "and . . . three times he stuck him," and "then I took him back home."  The prosecutor then read the stipulation to the jury as follows.

"Number one:  On September the 6th, 2007, DeJong drove to the Q-Cup retail center. [¶] Two:  He parked on a street behind the retail center. [¶] Three:  DeJong got out of his vehicle, went inside the Q-Cup, didn't buy anything, and walked back out. [¶] Four:  After DeJong left the Q-Cup he walked back to the car, got in, and began to drive away.  He turned north on Yuma--it's spelled Y-u-m-a.  He then turned onto Southside to Senter Road, went down Senter, saw Anthony Nguyen, did a U-turn, stopped in front of

13

the retail center, and then parked on the corner. After stopping there he drove to the back of the retail center. [¶] Number five: DeJong told the police that he was there approximately five to ten minutes before the stabbing."

Khek contends that the admission of the stipulation transgressed his right to confront the witnesses against him as explained in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Khek is incorrect.

In *Crawford*, *supra*, 541 U.S. at pages 53 through 54, 68, and *Davis v. Washington* (2006) 547 U.S. 813, the court held that admission of testimonial hearsay statements against a defendant violates the Sixth Amendment confrontation clause when the declarant is not, and has not previously been, subject to cross-examination. Further, because the confrontation clause applies to " 'witness[es] "against" ' " the accused, that constitutional provision is implicated only to the extent an out-of-court statement is "admitted 'against' defendant." (*People v. Lewis* (2008) 43 Cal.4th 415, 506.)

The issue of whether a statement is offered against a defendant for the purposes of the confrontation clause commonly arises in the situation addressed by the *Aranda-Bruton* line of cases (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123, 126-137), in which one defendant's confession or inculpatory statement that is offered in a joint trial as evidence against him by the prosecution also includes evidence that is inculpatory of a codefendant. If such a statement is properly redacted to remove reference to the codefendant and a limiting instruction is given, the statement may be admitted in a joint trial without violating the codefendant's right to confrontation, as it is not considered to be offered against the codefendant within the meaning of the confrontation clause. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211; *Gray v. Maryland* (1998) 523 U.S. 185, 196.)

Thus, when a statement "contain[s] no evidence *against* defendant," it "cannot implicate the confrontation clause." (*People v. Stevens* (2007) 41 Cal.4th 182, 199, italics added.)

14

Here, DeJong's statement contained no evidence against Khek because it neither identified Khek nor contained any inculpatory information as to him. "Thus, it cannot implicate the confrontation clause. [Citations.] The same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.' " (*People v. Stevens*, *supra*, 41 Cal.4th at p. 199.)

Because the trial court admitted DeJong's inculpatory statements, defendants contend that the excluded statements of DeJong's intent to hurt rather than kill were admissible under Evidence Code section 356. They again fail to demonstrate that the trial court abused its discretion by excluding the intent statements. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274 [we review a ruling under Evid. Code, § 356 for abuse of discretion].)

Evidence Code section 356 states in pertinent part, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

Evidence Code section 356, creates an exception to the hearsay rule "without labeling it as such." (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 863-864, fn. 13, disapproved on another point in *People v. Kimble* (1988) 44 Cal.3d 480, 496 & fn. 12.) It is known as California's "statutory version of the common law rule of completeness." (*People v. Parrish*, *supra*, 152 Cal.App.4th at p. 269, fn. 3.) "By its terms [Evidence Code] section 356 allows further inquiry into otherwise inadmissible matter only, (1) where it relates to the same subject, and (2) it is necessary to make the already introduced conversation understood. Thus, it has been held: the court must exclude such additional evidence if not relevant to the conversation already in evidence." (*People v. Gambos* (1970) 5 Cal.App.3d 187, 192-193, italics omitted.) The purpose of the section is to

place the portions of the admitted conversation or writing in context and to "prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156 (*Arias*).)

It is true that "[i]n applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry. 'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon*, *or connection with,* the admission or declaration in evidence. . . .' " (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1174 (*Hamilton*).) However, this standard does not create an open-sesame for anything said out of court on any subject merely because it was uttered on the same occasion as the statement admitted in evidence. As noted, Evidence Code section 356 requires the admission only of "the whole" of an out-of-court statement "on the same subject" as the part which has already come in. If "the same subject" means "anything discussed in the same interview," the Legislature's use of "the same subject" to qualify and limit "the whole" would be surplusage.

Khek argues that "it was appropriate to allow the jury to also learn that the scope of the planned attack had only involved hurting [Anthony] Nguyen, not killing him" because "the prosecution had been permitted to introduce evidence of DeJong's admissions that he had driven to the crime scene and been involved in the plan to attack Nguyen."

As is apparent, Khek patently fails to demonstrate that the trial court abused its discretion. That the trial court might have decided that it was appropriate to admit the intent statements under Evidence Code section 356 does not demonstrate that the decision to exclude the evidence was irrational. In any event, Khek could not demonstrate an abuse of discretion.

16

In the statement admitted by stipulation under the declaration against interest hearsay exception, DeJong essentially stated that he had driven to the crime scene. There is nothing incomprehensible or misleading about this statement that needs clarification from other statements that DeJong made in the same police interview. Moreover, the inference that the jury could reasonably draw from the statement is that DeJong participated in the crime while DeJong's statements about the scope of the planned attack that the trial court excluded pertained to DeJong's motive in committing the crime. But the motive statements did not relate to the introduced subject matter--DeJong's participation in the crime. They related to a different subject matter--DeJong's state of mind. As such, the motive statements may have explained why DeJong participated in the crime but were unnecessary to the jury's understanding that DeJong participated in the crime. (See *Arias*, *supra*, 13 Cal.4th at p. 156.) At best, the motive statements were cumulative in the sense of reinforcing the inference that DeJong participated in the crime.

It is true that motive statements can sometimes be on the same subject as the already-admitted evidence. For example, in *Hamilton*, the defense offered part of a witness's statement relating what defendant had told her about " 'the details' of the planned crime." (*Hamilton*, *supra*, 48 Cal.3d at p. 1174.) The trial court allowed the prosecutor to put on the entire statement, in which the witness also spoke of the defendant's motive, over defense counsel's objection that motive was outside " 'the subject' " of his evidence. The reviewing court upheld this ruling because "[d]efendant's conversations with [the witness] encompassed motive as well as plan, and counsel's questions draw no clear distinction between the two subjects." (*Ibid.*)

On the other hand, if the counsel in *Hamilton* had clearly defined "plan" as "the subject" for which he was offering the evidence, his objection that "motive" was outside that subject would have been well-founded.

17

Here, the People offered DeJong's statement to prove DeJong's participation in the crime. The trial court could have rationally concluded that DeJong's motive was outside that subject.

## JURY MISCONDUCT

Defendants contend that the trial court erred by denying their motions for a mistrial grounded on jury misconduct. They urge that the jury received extraneous information.

After the jury had sent a note to the trial court, the trial court held a hearing after excusing from the hearing Juror No. 5, Juror No. 9, Alternate Juror No. 1, and Alternate Juror No. 4, who professed no knowledge of the purpose for the hearing. The trial court's questioning of the remaining jurors revealed the following.

1.     Juror No. 10 stated that, when the jury was in the waiting room during the previous week, a young boy was pointing his cell phone at the jury as if he were taking the jury's picture; Alternate Juror No. 3 stated that he had seen the boy raising his cell phone as if he were snapping pictures and Juror No. 3 stated that it looked as if the boy were taking pictures; no other jurors saw the incident but the jurors had discussed the incident before Juror No. 10 wrote a note to the trial court to express concerns about the incident.

2.     Juror No. 10 stated that, on one occasion when the attorneys had approached the bench, Lee looked at the jury, made a hand gesture at his chin with his hand shaped like a gun, and scratched his chin when the attorneys turned around and returned to the defense table; no other jurors saw the incident but the jurors (except Juror No. 4 and Juror No. 11) had discussed the incident before Juror No. 10 wrote the note to the trial court (the trial court excused Juror No. 4 and Juror No. 11 from the hearing after learning that they did not participate in the jury discussion about the gun incident).

Outside the jury's presence, the parties identified the young boy as Anthony Nguyen's brother and the trial court called him to testify. The boy stated that he

18

possessed a cell phone but it did not have the ability to take photographs. The trial court then called the boy's father who testified that the boy's cell phone did not have the ability to take photographs. It then called back the individual jurors separately, questioned them in more detail about the two incidents, allowed defendants' attorneys to question them, and admonished them against talking about the case among themselves before the case was submitted to them. At the conclusion of this process, Khek moved for a mistrial grounded on the hand gesture. He argued that Lee had threatened the jury and he could not therefore "receive a fair trial because of the actions of Mr. Lee in a case where there are gang allegations, where there are incredible amounts of evidence showing them doing things together, for each other, with each other. I don't know how to describe Mr. Lee's threatening of jurors in any other way other than just outrageous conduct." Lee moved to discharge Juror No. 10 and Juror No. 3 because of the hand gesture.[3] He argued that Juror No. 10 could "no longer be fair and impartial" and Alternate Juror No. 3 "voiced some opinions that suggest that he has been significantly impacted by what he believed he saw." The People countered that no one except Juror No. 10 had seen the hand gesture and "not one juror on this case has said they have a serious concern about their own safety. Jury--Juror 10 said that but her conducts may belie her words." However, the People acknowledged that Juror No. 10 had transgressed the trial court's repeated admonishments against talking to others about the case: "[S]he did it not to a single person but did it collectively almost. She also apparently talked to her husband, which she didn't bring up, which she should have brought up, which she should have known was wrong, and that's of concern that she wasn't completely forthcoming; and the Court has repeatedly mentioned don't discuss the case with anyone."

---

[3] Lee later urged that he had grounds for a mistrial. According to Lee, Juror No. 10 had been ambivalent about whether the hand gesture was actually a simulated gun but her perception and communication that it was or might have been a gun prejudiced the jury against him.

19

The trial court declined to declare a mistrial but agreed to excuse Juror No. 10 and Alternate Juror No. 3. It explained as follows.

"The Court, as the record will reflect, spent a great deal of time examining the jurors. Although frankly not required and it's strictly within the Court's discretion, the Court felt the issues were important enough to allow counsel to voir dire the jurors as appropriate because the Court doesn't perceive itself as having any particularized wisdom in fact gathering. Having said that while counsel were examining the jurors, . . . the Court had the opportunity to observe the jurors. . . . [¶] The Court nowhere is making any factual findings. It is evident that Juror Number 10 sincerely--and frankly, [trial court addresses Lee's counsel], I don't think there was the equivalency--the--I don't think she was necessarily backing down. I think Juror Number 10 is adamant about what she believes she saw and she honestly believes she saw Mr. Lee make the gesture that she described. At most she would acknowledge that she couldn't know who was in his mind when she believes he made it. She has told us what her interpretation was. [¶] It is clear that none of the other 15 jurors saw the gesture or any type of gesture from Mr. Lee or Mr. Khek that would approximate the description of Juror Number 10. None, and all clearly conceded, none are in a position to evaluate whether it happened or it didn't happen. [¶] You challenged Juror Number 10, if any, challenged Juror Number 10's credibility for her honest belief in what she says she saw. But all of the rest were very frank that they didn't see anything. Notwithstanding that, Juror Number 10 did discuss her observations with most if not all of the balance of the jurors. There were several that were not involved in the discussion. And it was a combination of her telling them what she saw combined with showing them the note she wrote to give us on Monday and seeking their support as it were of the presentation of the note. For her reasons and-- speculation may be the wrong word--there are inferences to be drawn as to why she would do that. I think she has concerns. I think she wanted support from the balance of the jury, and notwithstanding the admonitions she shared all that information and sought

20

to perhaps bolster the note she referenced to the jurors she showed it to some of them the issues regarding the young man and the alleged perceptions or the perceptions of the cell phone and/or photos. Her observations of the young man involved her assumptions that it was a camera, and frankly most of the other jurors related their assumptions. This started apparently with one or more jurors standing in the hallway seeing the young man who apparently was making his presence aware to those around him because he's an eleven year old and causing one of the jurors to question, as Juror Number 3 told us, I wonder if he can take pictures. And that then evolved into certainly Juror Number 10 being concerned that their security was at risk if the young man was taking pictures of one or more of the jurors. To the extent there are facts, those are the facts. [¶] The only additional facts have to do with the discussion between Alternate Juror Number 3, Alternate Juror Number 1, and Juror Number 9 Monday after the noon recess prior to the beginning of the afternoon when we were in fact joined by alternate Juror Number 3. And the issue of the comments made by Alternate Juror Number 3 to Juror Number 9 not heard by [A]lternate Juror Number 1 . . . . [¶] . . . [¶] Alternate Juror Number 3 has--the questions the Court and counsel presented to him, his answers were all straight forward. He presented a demeanor that suggested no problem with moving forward. Some concerns about the issues regarding the camera. The flavor of the conversation with Juror Number 9, however, gives the Court pause for concern. That--not that he is failing to be candid, because I'm not sure whether he failed to deliver on specific questions asked, but he clearly understood the subjects of discussion. He immediately preceding [*sic*] that he had had a discussion with Jurors 9 and Alternate [No.] 1 that expressed his concerns, his feelings vis-à-vis retaliation, how those issues could be dealt with, protection, and conveyed a state of mind that the Court feels compromises his ability to be a fair and impartial juror. And the Court is going to exclude--is excusing, discharging Alternate Juror Number 3 as well as Juror Number 10. [¶] As to the balance of the jurors I'm not going to walk through them individually. They've been outlined. Their words

21

will stand for themselves.  I will say as to the remain[ing] jurors there was nothing in their demeanor, their responses, that suggested other than an honest understanding of the law, an honest understanding of their responsibility, the unfortunate as suspects of receiving the information they received, clear recognition that none of those are facts in the case proven as facts in the case, and will not be considered by them in any way, shape, or form; and the Court finds no concern or basis ultimately to cause excusal of any of the rest of the jurors beyond the two that have been outlined."

After excusing Juror No. 10 and Alternate Juror No. 3, the trial court admonished the jury against speculating about the jurors' absence and reminded the jury to bring concerns or issues about the case to it rather than discussing the point among themselves. It then replaced Juror No. 10 with Alternate Juror No. 4.

Defendants argue that the trial court should have granted their motions for a mistrial because there was jury misconduct--given that the trial court excused two jurors-- and the presumption of prejudice was not dispelled.  They dispute that the discharge of Juror No. 10 and Alternate Juror No. 3 was an adequate remedy.

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16. . . .)  A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." ' " (*People v. Nesler* (1997) 16 Cal.4th 561, 578; *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1123; *People v. Duran* (1996) 50 Cal.App.4th 103, 111.)

"A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require . . . examination for probable prejudice.  Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation." (*In re Hamilton* (1999) 20 Cal.4th 273, 294-295.)

22

"[T]ampering contact or communication with a sitting juror[] usually raises a rebuttable 'presumption' of prejudice." (*Id.* at p. 295.) "Still, whether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Id.* at p. 296.) We independently determine whether there was such a reasonable probability of prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

It is unclear, however, whether the rule of irregularity regarding exposure to events outside the trial evidence "applies to the jurors' perceptions of the defendant, particularly when the defendant engages in disruptive or otherwise improper conduct in court. As a matter of policy, a defendant is not permitted to profit from his own misconduct." (*People v. Williams* (1988) 44 Cal.3d 1127, 1156 (*Williams*).)

In *Williams*, an alternate juror informed the trial court that the defendant had threatened the jury when it returned the verdict in the guilt phase of a capital trial. (*Williams*, *supra*, 44 Cal.3d at p. 1154.) The issue of "invited misconduct" also arose in *People v. Hines* (1997) 15 Cal.4th 997, 1053-1055. In that case, two jurors received telephone calls from the defendant at home, and discussed the calls with individuals outside the jury, including the police. (*Id.* at pp. 1053-1054.) Citing *Williams*, the Supreme Court ruled: "Defendant is barred from complaining about any conceivable misconduct . . . in accepting his call because he invited any 'misconduct' by making the telephone call in the first place. [Citation.] Nor did [the jurors] act improperly when they discussed the calls with others: Although they were not permitted to discuss the *facts* of defendant's case with others, this prohibition did not extend to the telephone calls he made to them." (*Id.* at p. 1054, italics added.)

23

Thus, as a matter of policy, Lee cannot complain that the jurors engaged in misconduct based on his own hand gestures, acts that Lee concedes the jurors construed as improper.

As to Khek, we note that Khek cites no authority for his implicit proposition that an irregularity occurred upon the jury as a whole simply because the trial court found that an irregularity had occurred as to Juror No. 10 and Alternate Juror No. 3. " '[W]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant.' " (*In re Hamilton*, *supra*, 20 Cal.4th at pp. 305-306.) Here, none of the deciding members of the jury saw Lee's gesture. The communicative content of the gesture was not about guilt or innocence. And the jurors' discussions about the gesture were about the gesture, not the facts of the case. The presumption of prejudice simply did not arise in this case.

In any event, even assuming that the jurors' reaction to learning about Lee's hand gesture constituted an irregularity, the presumption of prejudice was rebutted by evidence that no prejudice actually occurred. (*People v. Honeycutt* (1977) 20 Cal.3d 150, 156.) The *Williams* court explained: " '[W]hether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecutor's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed.' " (*Williams*, *supra*, 44 Cal.3d at p. 1156.)

Here, the trial court implicitly concluded that the jury's impartiality had not been adversely affected. It articulated that the demeanor and responses of the remaining jurors convinced it that those jurors had an honest understanding of the law and their responsibility such that they would not consider the hand gesture in any way, shape, or

24

form.  We accept this determination.  (*People v. Nesler*, *supra*, 16 Cal.4th at p. 582 & fn. 5 ["We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence."].)  And, again, the gesture was not about guilt or innocence; it did not cause the jury to converse about guilt or innocence; and it was not inherently prejudicial because none of the remaining jurors saw the gesture.  Moreover, the trial court admonished the jury against speculating about the reasons why Juror No. 10 and Alternate Juror No. 3 had been excused.  There is no reasonable probability of prejudice.

Khek makes no reasoned argument to the contrary.  He points out that seven of the remaining jurors signed Juror No. 10's note to the trial court "to express their concerns," some of the remaining jurors "acknowledged having heard about the gun gesture," two jurors felt "uncomfortable," Juror No. 9 heard Alternate Juror No. 3 boast "of his ability to obtain protection from his friends and/or relatives in law enforcement if needed to deal with a threat arising from this very trial," Juror No. 9 "acknowledged being a 'little concerned,' " and Juror No. 8 "began scrutinizing . . . Lee's courtroom behavior more carefully."  He asserts that jurors do not always follow admonitions and the jury's four and one-half hour deliberation after a two-week trial indicates a "rush to judgment."

Again, the presumption of prejudice did not arise in this case and there is no reasonable probability of prejudice in any event.

The parties do not focus on the cell phone incident.  They mention it only in passing.  In any event, if it is misconduct, the incident is more accurately characterized as spectator misconduct.

"Misconduct on the part of a spectator is a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict.  [Citations.]  A trial court is afforded broad discretion in determining whether the conduct of a spectator is prejudicial."  (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022.)  In cases of spectator misconduct, prejudice is not presumed.  (*People v. Hill* (1992) 3 Cal.4th 959, 1002,

disapproved on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069.)
" '[I]t is generally assumed that such errors are cured by admonition, unless the record demonstrates the misconduct resulted in a miscarriage of justice.' " (*People v. Hill*, *supra*, at p. 1002.)

The cell phone incident was not of such a character as to prejudice defendants or influence the verdict for the same reasons we have given about the hand gesture incident. The jurors who saw the boy did not know whether he was, in fact, photographing them; being photographed did not pertain to defendants' guilt or innocence; being photographed did not cause the jurors to converse about guilt or innocence; being photographed is not inherently prejudicial; and the trial court admonished the jurors and became satisfied that the incident had not adversely affected the jurors' impartiality.

CALCRIM NO. 400

Murder is an unlawful killing committed with malice aforethought. (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Malice may be express or implied; it is express when the defendant intends to kill, and it is implied when the defendant deliberately commits an act that is dangerous to human life and acts with knowledge of the danger and a conscious disregard for life. (*Ibid*.)

Once the jury has found that the defendant committed murder (i.e., a killing with express or implied malice), it must then determine if the murder was of the first or second degree.

A defendant may be culpable for a crime as a direct perpetrator or as an aider and abettor. To be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) The aider and abettor is liable for (1) the offense committed by the perpetrator that was intended by the aider and abettor (the target offense), and (2) other offenses committed by the perpetrator that were not intended by

26

the aider and abettor but that were the natural and probable consequence of the intended offense. (*Id.* at p. 1117; *People v. Prettyman* (1996) 14 Cal.4th 248, 260-261 (*Prettyman*).)

Concerning the target offense intended by the aider and abettor, the aider and abettor's mens rea is the intent associated with the target offense. (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1118 & fn. 1.) In some circumstances the aider and abettor may be found guilty of a target offense that is greater or lesser than the offense attributed to the perpetrator, depending on the particular states of mind of the aider and abettor and the perpetrator and the availability of defenses to a particular crime. (*Id.* at pp. 1114, 1118-1120; *People v. Nero* (2010) 181 Cal.App.4th 504, 507, 513-517 (*Nero*); *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164 (*Samaniego*).) In the context of a target offense, aider and abettor liability is premised on the combined acts of all the participants, and "on the aider and abettor's *own mens rea*." (*People v. McCoy*, *supra*, at p. 1120, italics added.)

Lee argues that the trial court erred when it instructed the jury on general aiding and abetting principles in the language of former CALCRIM No. 400.

Using a standard CALCRIM No. 400 instruction, the trial court told the jury: "A person may be guilty of a crime in two ways. One, he [or she] may have directly committed the crime. I will call that person the perpetrator. Two, he [or she] may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is *equally guilty* of the crime whether he [or she] committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." (Italics added.)

Lee urges that "CALCRIM No. 400 instructed the jury that each principal was equally guilty of the perpetrator's offense without reference to that principal's mental state." According to Lee, the instruction was erroneous and misleading because "once

27

the jury concluded that Khek was guilty of first degree murder, [Lee], if found to be an aider and abettor, was necessarily 'equally guilty.' "

The courts have recognized that the "equally guilty" language in CALCRIM No. 400 can be confusing or misleading, and it has now been removed from the standard instruction. (*People v. Loza* (2012) 207 Cal.App.4th 332, 348, fn. 8 (*Loza*); *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 & fn. 5 (*Lopez*); *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1163-1165; see also *Nero*, *supra*, 181 Cal.App.4th at pp. 510, 518.) As noted above, an aider and abettor may be guilty of a target offense that is lesser than the perpetrator's offense, depending on the aider and abettor's state of mind and the availability of defenses. (See *Nero*, *supra*, at pp. 513-517; *Samaniego*, *supra*, at pp. 1163-1164.) Thus, in the context of homicide, CALCRIM No. 400's direction that a defendant is "equally guilty" of a crime whether he or she committed it personally or aided and abetted the person who actually committed it, while a generally correct statement of aider and abettor law, has the potential to be misleading, when the aider and abettor's intent is at issue. (*Samaniego*, *supra*, at p. 1165; see also *Nero*, *supra*, at pp. 517-519 [addressing CALJIC No. 3.00].)

The record here shows that any error in the inclusion of the "equally guilty" language in this case was harmless even if we apply the harmless-beyond-a-reasonable-doubt standard for misinstruction on the elements of an offense. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1165; *Lopez*, *supra*, 198 Cal.App.4th at pp. 1119-1120.)[4]

---

[4] Some courts have concluded that the "equally guilty" language is generally accurate and it might be misleading only in exceptional cases, and, absent a request for clarification of the instruction, the claim of error is forfeited on appeal. (*Loza*, *supra*, 207 Cal.App.4th at pp. 349-350; *Lopez*, *supra*, 198 Cal.App.4th at p. 1118; *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1163-1165.) In contrast, in *Nero*, the court concluded that the language can be misleading even in unexceptional circumstances. (*Nero*, *supra*, 181 Cal.App.4th at p. 518.) Given our holding of no prejudice, we need not address the People's forfeiture argument, nor need we discuss Lee's alternative contention that his (continued)

The "equally guilty" language creates the risk that the jury might think that, if it finds the defendant in some way aided the perpetrator with the criminal conduct, it necessarily must find the defendant guilty of the same offense as the perpetrator without determining the aider and abettor's particular state of mind. (See *Loza*, *supra*, 207 Cal.App.4th at p. 356; *Nero*, *supra*, 181 Cal.App.4th at p. 518; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1165.)

To support that the "equally guilty" language had this effect here, Lee does no more than urge that the jury could have found him guilty of first degree murder without determining his state of mind because "There was substantial evidence that [his] mental state was not consistent with first degree murder." We disagree with this analysis.

The instructions and closing arguments informed the jury that to convict Lee of first degree murder, he had to know about and intend to assist Khek's murderous purpose.

The trial court instructed in the language of CALCRIM No. 401: "To prove that the defendant Christopher Lee is guilty of a crime based on aiding and abetting that crime, the People must prove that: One, the perpetrator committed the crime; two, the defendant Christopher Lee knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and, four, the defendant's word or conduct did in fact aid and abet the perpetrator's commission of the crime."

The prosecutor argued: "Element two: You have to prove the defendant knew the perpetrator intended to commit the crime. What do we know? Chris Lee instigated it. He was the person who targeted Anthony. On September the 6th Lee IM'd Khek and told him, Khek, that Anthony just went to school today and Nancy just called me. . . . Lee also IM'd Khek. Hey, careful with your phone. Why would he say that? Because

counsel provided ineffective representation for not requesting omission of the "equally guilty" language.

29

he knows he's going to commit a crime. So be careful with your phone. . . . We know Lee knew he intended to commit the crime."

In the same fashion, Lee's defense counsel argued to the jury that Lee was not guilty of murder because he did not know about or intend to assist in Khek's plan to murder: "Mr. Lee must have known that the perpetrator intended to commit the crime. Now this, Ladies and Gentlemen, is where I think the key to this allegation against Mr. Lee is really disputed. Did he know that Kosal Khek intended to commit the crime of murder on September the 6th, 2007?"

In addition to the general aiding and abetting instruction containing the "equally guilty" language of CALCRIM No. 400 and the above-mentioned specific instruction in the language of CALCRIM No. 401 that explained in detail the mental state necessary to impose culpability on the basis of aiding and abetting rather than direct perpetration of a crime, the trial court provided the jury with instructions defining the elements of the target offense of murder, which detailed that the required state of mind for murder was express or implied malice aforethought.

We presume that jurors are able to understand and correlate the instructions. (*Lopez*, *supra*, 198 Cal.App.4th at p. 1119.) Reading the instructions as a whole, the jury knew that, to find Lee guilty of murder, it had to examine Lee's particular mental state and conclude that Lee knew about Khek's intent to commit a murder. Reasonable jurors would understand that the general instruction stating that a person "is equally guilty of the crime whether he . . . committed it personally or aided and abetted the perpetrator who committed it" merely meant that an aider and abettor cannot escape culpability just because he was not the direct perpetrator. There is nothing in the "equally guilty" language that suggested the jury should impose culpability on a defendant without applying the detailed aiding and abetting instructions requiring an evaluation of the defendant's particular mental state. Further, the clear focus of the closing arguments by both the prosecutor and Lee's counsel was whether Lee knew that Khek intended to kill.

30

On this record, there is no reasonable possibility that the jury would have used the "equally guilty" language to find Lee guilty of murder solely because he assisted Khek, without also finding that Lee met the aider and abettor requirements of a knowing intent to commit this offense.

This case is not in the same posture as *Nero*, *supra*, 181 Cal.App.4th 504 and *Loza*, *supra*, 207 Cal.App.4th 332, in which the courts found reversible error under circumstances where, during deliberations, the jury *asked questions reflecting confusion* about whether an aider and abettor could have a less culpable state of mind, and the trial courts failed to clarify the matter. (*Nero*, *supra*, at pp. 507, 510-520 [jurors asked if aider and abettor could be less culpable; court re-read instruction containing "equally guilty" language]; *Loza*, *supra*, at pp. 349, 352, 355-357 [jurors asked if they should consider the aider and abettor's state of mind; court referred jury back to the instructions].) Here, the instructions and closing arguments directed the jury to examine Lee's own particular mental state, and the jury did not ask any questions suggesting it did not fully understand this requirement.

We find beyond a reasonable doubt that the jury's findings of guilt would not have been any different had CALCRIM No. 400 been modified to remove the word "equally."

FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSES

"The rules governing instruction on lesser included offenses are well established. . . . [A] trial court must, sua sponte, instruct the jury on lesser included offenses ' "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " (*Prettyman*, *supra*, 14 Cal.4th at p. 274.)

Manslaughter is "the unlawful killing of a human being without malice." (Pen. Code, § 192.) It is a lesser included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154; *People v. Verdugo* (2010) 50 Cal.4th 263, 293.)

Lee contends that the trial court erred when it failed to instruct the jury sua sponte on the lesser included offenses of voluntary and involuntary manslaughter. He argues that there was substantial evidence that would support that he intended to commit a dangerous felony without malice (battery with serious bodily injury--voluntary manslaughter) or a dangerous misdemeanor without malice (battery--involuntary manslaughter).

"Inherent in [Lee's] contention [is] the proposition[] that an accomplice to a criminal offense may in some circumstances be guilty of a crime less serious than that committed by the principal, and that the trial court must, even in the absence of a request by the defense, instruct the jury on a lesser included offense arguably committed by the aider and abettor, even if the evidence would not support a jury finding that the actual perpetrator was guilty only of that offense." (*Prettyman*, *supra*, 14 Cal.4th at p. 275.)

Lee's argument is predicated on *People v. Woods* (1992) 8 Cal.App.4th 1570, which held that, under the natural and probable consequences doctrine, a defendant may be convicted of a lesser charge than the perpetrator of the crime. "In *Woods*, the defendant and a companion went in search of a rival gang member. They entered the apartment of two acquaintances of the member of the rival gang, and assaulted the occupants. As they were leaving, they saw two people getting into a car. The defendant's companion fired into the car, killing one occupant and injuring the other. At trial, the prosecution's theory was that the defendant was criminally responsible for the shootings committed by his companion, contending that the shootings were a natural and probable consequence of the crimes committed in the apartment that the defendant had aided and abetted. During deliberations, the jury asked, 'Can a defendant be found guilty of aiding and abetting a murder in the second degree if the actual perpetrator of the same murder is determined to be guilty of murder in the first degree?' The trial court answered, 'No.' The Court of Appeal held that this answer was prejudicial error." (*Prettyman*, *supra*, 14 Cal.4th at p. 275.)

32

"The *Woods* court reasoned that when the prosecution contends that the defendant is guilty as an accomplice under the 'natural and probable consequences' doctrine, the defendant 'does not stand in the same position as the perpetrator'; hence, 'the aider and abettor and the perpetrator may have differing degrees of guilt based on the same conduct depending on which of the perpetrator's criminal acts were reasonably foreseeable under the circumstances and which were not.' " (*Prettyman*, *supra*, 14 Cal.4th at pp. 275-276.)

"*Woods* also addressed the question whether the trial court should have instructed the jury on the lesser included offenses of voluntary and involuntary manslaughter. Although the court concluded that under the facts of that case such instructions were unnecessary, it held that in some cases such instructions would be necessary at the trial of an aider and abettor even if the evidence did not show that the *actual perpetrator* was guilty only of the lesser included offense. As the court explained: 'If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability.' " (*Prettyman*, *supra*, 14 Cal.4th at p. 276.)

In *Prettyman*, the court considered *Woods* in deciding whether a defendant who had been convicted of first degree murder under the natural and probable consequences doctrine was entitled to an instruction on involuntary manslaughter. It concluded that, "even if one were to assume that the trial court erred in failing to instruct the jury on involuntary manslaughter as a lesser offense necessarily included in the crime of murder, the error was harmless." (*Prettyman*, *supra*, 14 Cal.4th at p. 276.) It explained that the "trial court instructed the jury on the crime of second degree murder, a lesser offense included within the crime of first degree murder. The jury, by convicting [the defendant] of first degree murder rather than second degree murder, necessarily rejected the

possibility that the only natural and probable consequence of the crime she aided and abetted was involuntary manslaughter, a less serious crime. Because 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions' [citation], [the defendant] suffered no prejudice from any possible error in failing to instruct on involuntary manslaughter." (*Ibid.*)

The harmless error analysis in *Prettyman* applies equally here. The trial court instructed the jury that, to convict Lee of murder under the natural and probable consequences doctrine, it first had to be satisfied beyond a reasonable doubt that Lee was "guilty of assault with force likely to produce great bodily injury." It then explained that the jury would next have to find that a reasonable person in Lee's position would have known that the commission of first or second degree murder was a natural and probable consequence of the assault. It later instructed the jury on the elements of first and second degree murder.

As in *Prettyman*, by convicting Lee of first degree murder rather than second degree murder, the jury necessarily rejected the possibility that the only natural and probable consequence of the crime Lee aided and abetted was manslaughter, a less serious crime.

## ABSTRACT OF JUDGMENT

In pronouncing judgment, the trial court ordered defendants to pay restitution of $28,956.13 to the victim's family and $7,500 to the State Victims Compensation Board. It stated that "The orders are jointly and severally as to Mr. Khek and Mr. Lee."

Khek contends that his abstract of judgment should be corrected to provide that his liability should be "joint and several" with Lee. The People object and claim that Khek forfeited the point by failing to object below. We fail to understand the People's objection. The abstract of judgment fails to reflect the joint and several nature of the liability. This is simply a clerical error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [where an abstract of judgment differs from the sentencing court's oral judgment, the

34

abstract does not control].)  We will order modification of Khek's abstract of judgment to expressly state that the restitution order is joint and several as to Khek and Lee.  (See *People v. Neely* (2009) 176 Cal.App.4th 787, 800.)

Defendants complain that their abstracts of judgment do not reflect a joint and several liability with DeJong and Ly[5] who suffered judgments that included identical amounts of victim restitution.  The trial court, however, entered no such order as to DeJong and Ly during its oral pronouncement of judgment.

A trial court has discretion to order that codefendants share joint and several liability for victim restitution.  (*People v. Neely*, *supra*, 176 Cal.App.4th at p. 800.)  Defendants cite no authority for the proposition that the trial court is required to impose joint and several liability.  They argue that the trial court abused its discretion in failing to do so here because such an order would have been appropriate "so as to prevent an unsupportable multiple recovery."  But the trial court could have rationally decided not to make an order that would affect parties who were not before it because "Of course, each defendant is entitled to a credit for any actual payments by the other."  (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.)

## DISPOSITION

The judgment is affirmed.  Khek's abstract of judgment is modified to reflect that his liability for victim restitution and to the State Victims Compensation Board is joint and several with Lee's liability.

---

[5] Ly also was a former codefendant who had pleaded guilty to second degree murder before trial.

35

_____
　　　　　　　　Premo, Acting P.J.

WE CONCUR:


_____
　　　　Mihara, J.


_____
　　　　Márquez, J.

36