[No. C065058. Third Dist. Aug. 30, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
CRISTO LOPEZ et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III through IX.

COUNSEL

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant Cristo Lopez.

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant Rebecca Brousseau.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

DUARTE, J.—A jury convicted Cristo Lopez and Rebecca Brousseau of first degree murder and attempted robbery, and sustained firearm and robbery-murder allegations as to each. (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(17), 664, 211, 12022, subd. (a)(1) [Brousseau], 12022.53, subds. (b), (c), (d) [Lopez].) The trial court sentenced them to prison for life without the possibility of parole, and imposed unstayed terms of 25 years to life as to Lopez and one year as to Brousseau. Defendants timely appealed.[2]

Brousseau contends that (1) no substantial evidence supports the special circumstance finding; (2) the trial court erroneously instructed the jury; (3) alleged adoptive admissions she made in jail were improperly admitted; (4) she was entitled to instruction on included offenses; (5) the trial court used the wrong standard in evaluating her new trial motion; and (6) her sentence is unconstitutional. Brousseau also contends the trial court should have instructed the jury to consider whether Lynch was an accomplice. Lopez joins in this contention, and adds that Brousseau was an accomplice and the jury should have been so instructed. Both defendants also contend the trial court improperly imposed a parole revocation restitution fine, a point conceded by the People.

We shall strike the unauthorized fine, order a modification to clarify the abstracts of judgment, and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Brousseau lured the victim, Khet Saelee, into a secluded alley by promising an act of prostitution, to enable Lopez to rob the victim. Lopez then shot

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

[2] Two former codefendants did not appeal. Andrew Lynch pled guilty to obstructing a peace officer (§ 148, subd. (a)(1)), and Lopez's brother, Bictoriano Lopez (we shall refer to him as "Bictoriano" within the opinion, as he and defendant share the same last name), pled guilty to being an accessory after the fact (§ 32).

the victim. The authorities eventually persuaded four other individuals associated with the robbery or its aftermath to provide information regarding the facts and circumstances of the murder. These four individuals testified as witnesses for the prosecution at trial. Defendants also testified. What follows is a summary of the pertinent testimony heard by the jury regarding the facts and circumstances surrounding the planned robbery as well as the victim's shooting and later events.

The alley runs between Roosevelt Avenue and Baker Avenue to the north and south, "dead-ends" to the west, and is accessed from Stockton Boulevard to the east.

On the night of November 22 to 23, 2008, the victim left home to go to a bachelor party with his cousin, who had asked him to bring beer. His cousin called him after midnight and told him to hurry up, but the victim never arrived.

The next morning, a man who lived in a unit at 4929 Baker Avenue, near the end of the alley, found the victim in his car by the end of the alley, and called 911. The victim was in the front seat, which was slightly reclined, and his pants were unbuckled. The keys were in the "on" position and the car was in reverse, and had been backed into a fence, where it ran out of gas. The victim had $5 in his right front pants pocket, $200 in his right rear pants pocket, and his wallet was found in the driver's door panel. An unrolled condom was on the ground near the car, but it was not tested for DNA.

The victim had been shot through the left arm, and the bullet, consistent with a .38-caliber bullet, had reentered the body and pierced his heart. He could have lived long enough after being shot to start his car, put it in reverse, and try to drive off.

## A.  *Crawford's Testimony*

On April 8, 2009, Amy Lee Crawford was arrested for failing to complete work project duties arising from a felony car theft conviction; when questioned, she gave information about this case. By the time of trial, she was on felony probation arising from an unrelated burglary case.

Crawford testified she lived at 4929 Baker Avenue. She had known Lopez since he was 13, and had met Brousseau in 2008. She had had sex with Lopez in the past, but had never dated him. On the night of the killing, she met defendants on her way to a liquor store. Lopez was intoxicated, "hypie"

and "wild." The trio walked toward Lopez's mother's house, but changed their minds and walked to Lynch's house, on Roosevelt Avenue "just beyond" the end of the alley. Defendants planned "a quick come-up, and they were talking about robbing some tricks." Lopez said, "Hey, let's rob some tricks, and [Brousseau] agreed to it, and she's, like, I'll go pull a trick." Brousseau said she would go to Stockton Boulevard, and "bring them to the alley." When Crawford objected that this was too close to her house, Lopez reassured her that "it wasn't going to be that serious." Nothing was said about a gun.

According to Crawford, when the trio reached Lynch's house, Lopez alone went in and then came out. They walked back, and Crawford and Lopez went to Crawford's yard and smoked cigarettes, while Brousseau went to Stockton Boulevard. Lopez then stood "in the dark," waiting. Crawford heard a car drive to the end of the alley, and after about five minutes, Lopez "went into the alley, and I heard arguing, and I heard Ms. Brousseau scream and get out of the car and start running down the alley." Crawford went to the alley and saw Lopez "arguing with a guy through the window" saying, "Give me your money." She followed Brousseau "and we got almost to the end of the alley, and we heard a gunshot." Crawford walked to Roosevelt Avenue, and saw Lopez "running ahead of us." All three met at Lynch's house, although Crawford denied the meeting had been planned. Lopez alone went in, and came out after five or 10 minutes.

While they were waiting for Lopez, Crawford asked Brousseau what happened, and she replied, "I freaked out. He knocked on the window with a gun." Brousseau also said she dropped a condom in the car. When Lopez came out with Lynch, the two men smoked cigarettes, Lynch returned to his house, and the trio went to a back room that had been added on to Lynch's house, used methamphetamine, then fell asleep. Crawford had sex with Lopez that night. Later, Lopez said he left the gun at Lynch's house.

### B. *Lynch's Testimony*

Lynch was arrested on an unrelated matter at his house on April 8, 2009, with Bictoriano. On March 2, 2010, Lynch agreed to testify truthfully for a reduction of a felony accessory to murder charge to a misdemeanor charge of interfering with a peace officer's investigation, with a time-served sentence.

Lynch testified he had lived at 4900 Roosevelt Avenue, about five or six houses down from where the victim's car was found. He had known Lopez for 10 to 12 years, and had seen Brousseau about five times. When Lopez

came by the house that night, Lynch went outside to smoke a cigarette, and he did not let Crawford or Brousseau inside. Lynch agreed that Lopez could use his back room, accessible through the backyard, later. Lopez left for about 30 minutes, and when he returned, he asked if Lynch could store a gun. Lynch told Lopez that Lopez knew where to put it, in a "tuck spot" on a hook under the stairs in Lynch's room. Lynch did not think Lopez had retrieved the gun from his house earlier and did not see him go to where guns were kept. The next morning, Lopez's brother Bictoriano came to retrieve his gun, and Lynch told him where to get it, but did not see the gun. He admitted he had seen Lopez with a gun when Lopez came in that night, describing it as a .38-caliber Smith and Wesson revolver. When asked if Lopez had picked up the gun from Lynch earlier that night, Lynch replied, "I don't think so." Lynch had seen Bictoriano with that gun before, which he would leave at Lynch's house. According to Lynch, Bictoriano came to the house the morning after the murder, which was also the morning after Bictoriano's daughter's birth, and Lopez showed up after he left. The three men were not together on or near November 23d, and Lynch did not show the other two men a gun.[3]

### C. *Bictoriano's Testimony*

After Bictoriano was arrested and refused to give information, he was charged with accessory to murder. On the day the preliminary hearing had been set, August 20, 2009, Bictoriano gave a statement to law enforcement. He agreed to plead guilty and testify truthfully, in exchange for a time-served sentence.

Bictoriano testified his daughter was born November 22, 2008. A few days later he visited Lynch to share this news.[4] Later that day, at Lynch's, he saw Lopez. Lopez "told me something had went wrong, he had hurt somebody." Lopez told him about a gun; Lynch pointed towards a tree in the yard, where Bictoriano found the gun, and took it to "get rid of it" and help his brother. It was a .38-caliber revolver. He denied going to Lynch's house the morning of the shooting, and denied the gun was his.

### D. *Peralez's Testimony and Jail Visits*

On March 10, 2010, Monica Peralez was arrested while working as a prostitute, in a sting set up by Detective Cvitanov. She was given use

---

[3] Lynch testified that Bictoriano lied at the preliminary hearing, by saying he had come to Lynch's house three or four days after the shooting, by testifying the gun was not his, and by testifying Lynch showed him where the gun was, in the backyard.

[4] Bictoriano testified his daughter was in intensive care and he stayed at the hospital after her birth; hence, he did not visit Lynch the morning after the killing.

immunity to protect her from charges of prostitution, witness intimidation, and being an accessory to murder.

Peralez married Lopez after he had been charged with the instant offenses. She had known Lopez for about eight years. Lopez told her before he was arrested that he shot a man in the arm, in an alley, and also told her he shot the man by accident. She visited Lopez in jail in April 2009, and he told her to visit Brousseau in jail, and tell her he was going to take all the blame and she should not say anything. Peralez had never met Brousseau. Peralez wrote down the message, and held it up to the visiting room window. Lopez had told her to write the message down, to avoid being recorded, and told her what to say. The message said, "Chris says not to worry, just don't say nothing, it will all be okay, he's going to take the blame for it . . . ." It said nothing about a rape. Brousseau looked at the note, then "[s]he was crying. And she said that they had already found DNA on a condom, and that was that." Brousseau mouthed the words. Brousseau also made a gesture, mimicking a condom. The next time Peralez visited Lopez, she told him what Brousseau said. Brousseau's counsel asked Peralez if she could read lips, and she testified she could.

Detective Jason Cvitanov testified Peralez visited with Lopez on April 12, 2009, saw Brousseau on April 14, 2009, and next visited Lopez on April 19, 2009. Nothing could be heard on the recording for the Peralez-Brousseau visit. However, it was common for jail visitors to bypass the recording system by mouthing words or using notes.

E. *Brousseau's Testimony*

Brousseau testified on her own behalf. She had been homeless at the time of the murder, but sometimes stayed with Anthony Jimenez during November 2008, on the other side of a duplex from Crawford, who was Jimenez's sister-in-law. Brousseau used drugs, worked as a prostitute, and had two misdemeanor theft convictions. Late on the night of the shooting, after midnight, Brousseau left Jimenez's house to buy some cigarettes and turn a trick. On the way to the store she met Crawford and Lopez, whom she knew. They were talking about "coming up on"—or robbing—"a dude on a bike," but Brousseau never discussed robbing anyone with them, or taking anyone into the alley. Because it was so cold, Brousseau turned around and walked back towards home. When the victim pulled up in his car, she got in and directed him to the alley, where she "usually" took customers; she felt safe there because it was near where she was staying and people in the area knew her. The victim unbuckled his trousers and leaned back as Brousseau searched in her bag for a condom. Then she heard the victim cry out, "Oh, my God, he's got a gun." As she fled, she saw Lopez by the driver's side

door. Although she had not seen a gun, and knew it was Lopez, she "felt safer running towards Stockton Boulevard." When she reached the end of the alley, she ran into Crawford, "heard a pop" and knew someone had been shot, and they "ended up" in Lynch's back room. Brousseau had not been at Lynch's house earlier. After a short while, Lopez came in, and the three spent the night.

Brousseau testified Peralez visited her in jail, but Brousseau did not know who Peralez was, and was confused by her visit. Peralez held up a note that said in part, Brousseau "needed to tell the cops that I was being raped," and Brousseau began to cry, because she was being further entangled in something she was not part of. Brousseau never mouthed anything to Peralez about a condom or DNA. When asked why she had never told this story before, Brousseau said she was afraid of being a snitch.

### F. *Lopez's Testimony*

Lopez testified on his own behalf. He was 23 and had known Lynch since he was about 10, they had been best friends, and he had known Crawford since he was 13. He met Brousseau early in 2008, "around the neighborhood." On the night of the shooting, he was intoxicated. He was "[o]n ecstasy, a little bit of meth, and I was drinking." While wandering around he met Crawford and Brousseau, and the trio "were just kind of chatting, talking while we were walking." They were going to go to Lopez's mother's house, but he decided to go to Lynch's house, to hang out with "the girls" in Lynch's back room, which Lopez had used before. Lynch allowed them to use the room. They were there for about 15 minutes, with Lopez drinking beer and taking more Ecstasy pills, while his companions used methamphetamine. They decided to go get more beer.

At some point, Lopez got his brother Bictoriano's gun from Lynch's house. The trio first went to Crawford's house, so she could get a jacket, and as Lopez waited by a picnic table, Brousseau left and said she would be back. When Crawford came out, she and Lopez talked about what to do "because we didn't have any money. We were trying to see if we could get some beer." During trial, Lopez conceded that if Brousseau turned a trick, the trio would have had money for beer, although he maintained that particular topic was not discussed at the time. As Lopez and Crawford talked, a car pulled up into the alley, which was not unusual, as people used the alley for drugs and prostitution. When Lopez saw the car shaking for about three minutes, he approached, and saw Brousseau jump out and run, after she cried out. Lopez claimed that he had no intent to rob anyone, but was trying to help, or stop the occupants from "causing a mess, causing trouble." When Lopez asked the driver what he was doing, the driver reached toward his side, and Lopez got scared and shot him.

Lopez ran back to Roosevelt Avenue and went to Lynch's back room, where the "girls" joined him. He testified he returned the gun to Lynch's room, but also testified, "I told him I fucked up and to put it up." He did not call the police because he "had no right to shoot the man." Lopez testified he had sex with both Crawford and Brousseau that night. He admitted telling Peralez to see Brousseau and tell her he was taking responsibility, but he did not tell Peralez to say anything about a rape. He could not clearly explain why, if no robbery had been planned, it was important for Brousseau not to say anything. He admitted that he told Peralez during one jail call or visit that he could get less time if he had been trying to protect somebody. He denied he had told his brother Bictoriano that something went wrong; he said instead that he had told his brother, "I fucked up." Lopez denied discussing a robbery with Brousseau or Crawford, and said that neither knew he had a gun. When questioned by the police, he had said he saw a "guy" who was "getting on," i.e., raping his "home girl," whom he also described as "Amy's home girl." Lopez also had told the police Brousseau and Crawford knew he had a gun and they could have planned "to jack the guy" behind Lopez's back. Lopez was impeached with one car theft conviction and two burglary convictions.

## G. *Argument*

The People argued Brousseau had to know Lopez was going to commit robbery, and she intended to aid him in that endeavor. Her act of fleeing from the car was part of the robbery plan, to give her the ability to say she did not know of the robbery, if the victim identified her. If she really had been scared, she would have run to Jimenez's house, which is why she used the alley regularly, and she would not have joined Lopez and Crawford at Lynch's house after the murder. There was no reason for Crawford to lie to the authorities, and her statement put her "in the middle" of the planned robbery. Crawford knew of the planned robbery and did nothing to stop it, and knew that Lopez had a gun.

The People emphasized that, if the jury were to find that Crawford was an accomplice, only slight evidence would be needed to corroborate her story. Bictoriano and Lynch were not accomplices, because they only helped after the crime, and there was no evidence they knew about the robbery earlier.

Brousseau's counsel argued the only evidence supporting an attempted robbery came from Crawford, who lacked credibility. Lopez's counsel, too, argued the felony murder theory hinged on Crawford, and suggested the jury convict Lopez of second degree murder or voluntary manslaughter.

## H. *Verdicts*

The jury convicted defendants of first degree murder and attempted robbery, with a robbery-murder special circumstance. (§§ 187, subd. (a),

190.2, subd. (a)(17), 664, 211.) The jury found Lopez personally and intentionally discharged a firearm, causing death (§ 12022.53, subds. (b), (c), (d)), and found Brousseau was a principal in the attempted commission of a felony where another principal was armed with a firearm (§ 12022, subd. (a)(1)).

## DISCUSSION

### I

### *Special Circumstance*

Brousseau contends no substantial evidence supports the robbery-murder special circumstance finding, because the evidence does not show she acted with reckless indifference to human life. Although this was not a capital case, the issue she raises arises from capital sentencing rules formulated by the United States Supreme Court, explained as follows:

■ "[Penal Code section 190.2, subdivision (d)] was added to existing capital sentencing law in 1990 as a result of the passage of the initiative measure Proposition 115, which, in relevant part, eliminated the former, judicially imposed requirement that a jury find intent to kill in order to sustain a felony-murder special-circumstance allegation against a defendant who was not the actual killer. [Citation.] Now, pursuant to section 190.2(d), in the absence of a showing of intent to kill, an accomplice to the underlying felony who is not the actual killer, but is found to have acted with 'reckless indifference to human life and as a major participant' in the commission of the underlying felony, will be sentenced to death or life in prison without the possibility of parole. [Citations.]

"The portion of the statutory language of section 190.2(d) at issue here derives verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676] (hereafter *Tison*). In *Tison*, the court held that the Eighth Amendment does not prohibit as disproportionate the imposition of the death penalty on a defendant convicted of first degree felony murder who was a 'major participant' in the underlying felony, and whose mental state is one of 'reckless indifference to human life.' (*Tison, supra,* 481 U.S. at p. 158 & fn. 12 [95 L.Ed.2d at pp. 144–145].) The incorporation of *Tison*'s rule into section 190.2(d)—in express terms—brought state capital sentencing law into conformity with prevailing Eighth Amendment doctrine." (*People v. Estrada* (1995) 11 Cal.4th 568, 575 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

Brousseau contends there was no evidence she intended to kill, and argues that even if the record supports a finding she was aware of Lopez's purpose

to commit robbery, and aided him by luring the victim into the alley, there was no evidence she knew he had a gun; therefore "the theft or robbery was likely to come off without anyone getting hurt."

In assessing this claim, we view the evidence and reasonable inferences in the light favorable to the verdict. (*People v. Proby* (1998) 60 Cal.App.4th 922, 928 [70 Cal.Rptr.2d 706] (*Proby*).)

The jury was instructed that in order to return a true finding on the special circumstance, it had to find Brousseau acted with reckless indifference, and a person so acts "when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death."

Although Lopez testified at trial that he did not show Crawford or Brousseau the gun, nor did he mention a robbery to them, he had previously told law enforcement that both women knew he had the gun, and they may have been planning "to jack the guy" behind Lopez's back. The jury could have believed Lopez's inconsistent statement that the women knew he had a gun. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1219 [14 Cal.Rptr.2d 702, 842 P.2d 1].) There was evidence the women were with Lopez when he presumably picked up the gun from Lynch's house, although they did not go inside Lynch's house. Given the evidence of joint activities, the jury could rationally find Lopez told the authorities a partial truth—the women knew he had the gun—and then lied about it at trial. The fact Brousseau knew Lopez had a gun shows that she acted with reckless indifference to the life of the man she lured into the alley. (See *Proby, supra,* 60 Cal.App.4th at pp. 928–930.)

Brousseau dismisses Lopez's inconsistent statement, arguing, "this was merely part of his initial effort to shift the blame to the women and away from himself. [Citation.] This version was not relied on by the prosecutor in argument, and it was implicitly rejected by the jury's verdict convicting [Lopez] of the Saelee murder." We disagree. That this evidence was not mentioned in argument does not mean it was not considered, and the fact the jury did not credit a portion of Lopez's statement to the authorities does not necessarily mean that it discredited the earlier statement in its entirety. The People invited the jury to infer from other evidence that Brousseau knew Lopez had a gun, and did not disclaim reliance on Lopez's inconsistent statement about the gun.

Further, Brousseau's knowledge of the gun before the robbery is not necessary to uphold the jury's finding of special circumstances.

In *People v. Hodgson* (2003) 111 Cal.App.4th 566 [3 Cal.Rptr.3d 575] (*Hodgson*), Hodgson aided Salazar, who planned to rob the victim (Nam)

when she drove into a gated parking garage. Hodgson held the sliding garage door open, and tried to keep the door open to allow Salazar to get out of the garage. (*Hodgson, supra*, 111 Cal.App.4th at pp. 570, 576–577.) The court upheld a robbery-murder special circumstance:

"The present case does not present evidence appellant supplied the gun, or was armed, or personally took the loot, or the like. Nevertheless, his role in the robbery murder satisfies the requirement his assistance be 'notable or conspicuous in effect or scope.' [Fn. omitted.]

"To begin with, this is not a crime committed by a large gang or a group of several accomplices. Instead only two individuals were involved. Thus, appellant's role was more 'notable and conspicuous'—and also more essential—than if the shooter had been assisted by a coterie of confederates. . . . Because appellant was the only person assisting Salazar in the robbery murder his actions were both important as well as conspicuous in scope and effect.

"A rational juror could also have found the evidence established appellant acted with 'reckless indifference to human life.' This phrase 'is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death.' [Fn. omitted.] Even after the first shot it must have been apparent to appellant Ms. Nam had been severely injured and was likely unconscious. . . . Appellant had to be aware use of a gun to effect the robbery presented a grave risk of death. However, instead of coming to the victim's aid after the first shot, he instead chose to assist Salazar in accomplishing the robbery by assuming his position at the garage gate and trying to keep it from closing until Salazar could escape from the garage with the loot." (*Hodgson, supra*, 111 Cal.App.4th at pp. 579–580.)

Similarly, in *People v. Smith* (2005) 135 Cal.App.4th 914 [38 Cal.Rptr.3d 1] (*Smith*), disagreed with on another point in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291–292 [85 Cal.Rptr.3d 393], the court upheld a robbery-murder special circumstance as to a man who acted as a lookout outside a room while a codefendant beat and stabbed the victim in the room, and who did not seek help when the codefendant left the room, finding his actions reflected reckless indifference to the victim's life. (*Smith, supra*, 135 Cal.App.4th at pp. 927–928.)

Brousseau's act of luring the victim into the secluded alley was critical to the robbery's success. After hearing what she knew was a gunshot, she failed to help the victim or call 911. Instead she went to Lynch's house and stayed with defendant and Crawford for the rest of the night and, on the evidence, engaged in sexual intercourse with Lopez. Her actions reflect utter indifference to the victim's life.

Brousseau claims the secluded location *lessened* the chance of violence, stating, "the increased vulnerability of the victim here made it less likely that there would be resistance and injury." We disagree. A person trapped in a secluded place, with no help in the offing, might resist an attempted robbery, or the robber might be emboldened to act violently, with reduced fear of capture, in a secluded place.

We conclude substantial evidence supports the robbery-murder special circumstance as to Brousseau.

## II

### *Aiding Instruction*

Brousseau contends the trial court erred by instructing the jury that a perpetrator and an aider are "equally guilty" of the crime. Any error was harmless.

The introductory instruction to the series of instructions on aiding, CALCRIM No. 400, as given in this case, provides: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."

■ Generally, a person who is found to have aided another person to commit a crime *is* "equally guilty" of that crime. (§ 31; see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122–123.)

However, in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1114–1122 [108 Cal.Rptr.2d 188, 24 P.3d 1210] [an aider might be found guilty of first degree murder, even if shooter is found guilty of manslaughter on unreasonable self-defense theory]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577–1578 [11 Cal.Rptr.2d 231] [aider might be guilty of lesser crime than perpetrator, where ultimate crime was not reasonably foreseeable consequence of act aided, but a lesser crime committed by perpetrator during the ultimate crime was a reasonably foreseeable consequence of the act aided].)

■ Because the instruction as given was generally accurate, but potentially incomplete in certain cases, it was incumbent on Brousseau to request a modification if she thought it was misleading on the facts of this case. Her

failure to do so forfeits the claim of error. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627] [party may not claim "an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language"]; see *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163–1165 [91 Cal.Rptr.3d 874] (*Samaniego*) [challenge to CALCRIM No. 400 forfeited for failure to seek modification]; but see *People v. Nero* (2010) 181 Cal.App.4th 504, 517–518 [104 Cal.Rptr.3d 616] (*Nero*) [construing CALJIC No. 3.00, also using the "equally guilty" language, and finding it misleading "even in unexceptional circumstances"].)[5]

Further, we see no prejudice. Brousseau contends the jury may have found she intended to commit a theft from the person of the victim, not a robbery. But the gist of her testimony was that she had no criminal purpose and was surprised by Lopez's actions. As we explain in the unpublished portion of our opinion, there was no evidence she intended to help Lopez steal from the victim, other than by use of force or fear.

To the extent Brousseau contends the instruction reduced the People's burden of proof by eliminating the need to *prove* Brousseau's intent, we disagree. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [111 Cal.Rptr.2d 129, 29 P.3d 209].) Other instructions elaborated on the required intent.

CALCRIM No. 401, as given in this case, provided in part:

"To prove that defendant, Rebecca Brousseau is guilty of attempted robbery crime [*sic*] based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

---

[5] We note that CALCRIM No. 400 has been amended to remove the "equally guilty" language. (Judicial Council of Cal., Crim. Jury Instns. (2011) p. 167.)

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

By specifying attempted robbery, and stating the aider must share the perpetrator's purpose to commit "that" crime, the instruction told the jury it had to find Brousseau shared Lopez's purpose to commit a robbery. Further, CALCRIM No. 540B, defining Brousseau's liability for murder, required the jury to find she "committed or attempted to commit, or aided and abetted a robbery" before finding murder liability. Robbery was defined, and the jury was told, "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery."

Thus, even if we were to accept Brousseau's premise that CALCRIM No. 400 impairs the intent element, the error was harmless because the point was covered elsewhere. (*People v. Stewart* (1976) 16 Cal.3d 133, 141 [127 Cal.Rptr. 117, 544 P.2d 1317]; *Samaniego, supra,* 172 Cal.App.4th at p. 1165.)[6]

Contrary to Brousseau's claim in the reply brief, the other instructions given (CALCRIM Nos. 401 & 540B) did not *conflict* with the "equally guilty" language in CALCRIM No. 400; they *defined* and detailed the circumstances under which Brousseau could be found liable for the same crimes as Lopez.

In the absence of evidence of Lopez's intent to commit any crime other than robbery, and considering the detailed instructions requiring the jury to find Brousseau aided a robbery, no rational jury would have misused the "equally guilty" language to convict her of attempted robbery without finding she intended to aid a robbery. Therefore, any error was harmless.

III–IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] In *Nero, supra,* 181 Cal.App.4th 504, when asked by the jury whether there could be different levels of liability between perpetrator and aider, the trial court twice referred it to an instruction using the "equally guilty" language, and there was evidence supporting different levels of liability. *Nero* found the error prejudicial. (*Id.* at pp. 518–520.) No jury confusion is evidenced in this case, nor is there evidence showing Brousseau could be guilty of something less than felony murder, along with Lopez. Therefore, even if *Nero* were correctly decided, it does not require reversal in this case.

*See footnote, *ante,* page 1106.

## DISPOSITION

The parole revocation restitution fines are stricken. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation modified abstracts of judgment consistent with this opinion. In all other respects, the judgments are affirmed.

Raye, P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied September 29, 2011, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied November 22, 2011, S196883.