Filed 6/21/16  P. v. Burton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C073883 |
| v. | (Super. Ct. No. SF119250A) |
| RICHARD EARL BURTON, | |
| Defendant and Appellant. | |

A jury convicted defendant Richard Earl Burton of unauthorized driving or taking of a motor vehicle (count 7), participation in a criminal street gang by promoting, furthering or assisting in felonious criminal conduct (count 12), and misdemeanor resisting, obstructing, or delaying a peace officer (count 13).  The trial court sentenced defendant to an aggregate of seven years in prison.

Defendant now contends (1) there is insufficient evidence that he aided and abetted the unauthorized driving or taking of a stolen Pontiac; (2) the trial court erred in instructing the jury with former CALCRIM No. 400 because it incorrectly suggested that if the jury found codefendant Shaquille Lash guilty, it must also find defendant guilty, and the prosecutor also misstated the law by telling the jury that an aider and abettor "steps into the shoes" of the perpetrator and adopts the acts of the perpetrator; and (3) if we reverse the judgment as to the unauthorized driving or taking of the Pontiac (count 7), we must also reverse the judgment as to count 12 (promoting felonious gang conduct), because count 12 is based on the count 7 felony conviction.

We conclude (1) viewing the entire record in the light most favorable to the judgment, substantial evidence supports the jury's finding that defendant aided and abetted in the unauthorized driving or taking of the Pontiac; (2) considered together, the instructions given made clear the jury had to examine defendant's own acts and mental state to find him guilty as an aider and abettor, and the prosecutor did not misstate the law; and (3) we need not address defendant's final contention because his challenges to the conviction for unauthorized driving or taking the Pontiac lack merit.

We will affirm the judgment.

BACKGROUND

Celeste Sanchez's silver Pontiac was taken from her apartment complex parking lot in Stockton on December 26, 2011.[1] She may have left a spare key in her car. Sanchez did not give anyone permission to take her car.

Jagbir Sandhu was sitting in his pickup truck, on the driveway of his house in Stockton, at around 7:00 a.m. on December 28, waiting for his employee Jatinder Kumar to arrive, when he noticed a silver car park behind his truck. Sandhu saw a man exit from

---

[1] All dates refer to 2011 unless otherwise indicated.

the driver's side of the silver car. That man put a gun to Sandhu's ear and ordered Sandhu to roll down the passenger's side window of the truck. Fearing for his life, Sandhu complied. A second man stood at the passenger side of the truck. That man did not have a gun.

The gunman said he was going to rob Sandhu. He asked if Sandhu had any gold on him. Sandhu responded no. The gunman hit Sandhu with the butt of his gun, causing Sandhu to bleed. The second man hit Sandhu's head six or seven times. The gunman took Sandhu's cell phone, wallet, and watch, as his cohort took three computers and other items from the back seat of Sandhu's truck.

The robbers then approached Kumar, who had arrived at Sandhu's house in his Toyota Camry. The robbers yelled that if Kumar did not want to die, he should give the robbers everything he had. Kumar stepped out of the Camry. One of the robbers put a gun on the side of Kumar's abdomen. Kumar saw only one gun.

The second robber took Kumar's wallet and cell phone, and drove away in the silver car that was parked behind Sandhu's truck. Kumar had about $50 and Indian currency in his wallet. The Indian currency contained a number which had religious significance to Kumar. The gunman drove away in Kumar's Camry.

Law enforcement authorities found Kumar's Camry parked on Astor Drive in Stockton later that morning. The Camry was unoccupied and there was no one in the area. Officers established surveillance of the area.

California Highway Patrol Investigator Anthony Benatar, a member of the surveillance team, saw Sanchez's Pontiac, which had been reported stolen, drive past his surveillance location at about 2:40 p.m. on December 28. The investigator followed the Pontiac. The Pontiac stopped at Cortez Park. It appeared to Detective Nesbitt, another member of the surveillance team, that defendant and codefendant Aaron Ramsey were talking with the girls who were in a car stopped in front of the Pontiac. Detective Nesbitt

3

used his car to block the driver's side of the Pontiac and activated the red and blue lights of his car. Investigator Benatar stopped his car behind the Pontiac.

Detective Nesbitt approached the Pontiac with his gun out and yelled "police, let me see your hands." Detective Nesbitt wore a vest with a police patch in the front and the word "police" across the back. Investigator Benatar also shouted "police."

Shaquille Lash was in the driver's seat of the Pontiac. Defendant and Ramsey were in passenger seats. Defendant, Lash, and Ramsey got out of the Pontiac and ran.

Investigator Benatar chased Ramsey through the park. He saw Ramsey throw something. Police later recovered a pair of sunglasses from the park. Kumar identified the sunglasses as belonging to him. Officers apprehended Ramsey with the aid of a police dog.

Detective Nesbitt chased Lash. Lash jumped fences as he ran from police. He took off his blue jacket and then his T-shirt as he fled. Investigator Benatar eventually apprehended Lash. The investigator found Indian currency and paperwork from the Pontiac in Lash's pants pocket. The Indian currency found on Lash was the currency the robber took from Kumar.

Detective Shawn Morin followed defendant through the park in his patrol car, with his vehicle lights flashing. Detective Morin ordered defendant to stop, hitting the air horn and siren of his patrol car. Defendant got down on the ground and was taken into custody. No stolen property or weapon was found on defendant.

There was a key in the ignition of the Pontiac. Officers found paperwork belonging to Sandhu, checks and a checkbook from Sandhu's company, a binder belonging to Sandhu, a medication bottle Sandhu identified as belonging to his ex-wife, and Sandhu and Kumar's cell phones in the trunk of the Pontiac. Sandhu and Kumar identified the property found in the trunk of the Pontiac as belonging to them.

Police never found any gun associated with this case. The keys to the Camry, Sandhu's computers, Kumar's wallet, and Kumar and Sandhu's credit cards and watches were never located.

Police conducted an in-field show up on December 28. Investigator Benatar told Sandhu and Kumar officers had located Kumar's Camry and had detained suspects. With the help of an interpreter, Investigator Benatar admonished Sandhu and Kumar as follows: "I would like to show you one or more people. I want you to keep an open mind. The person who committed the crime may or may not be among those present. Just because the person is in custody or being detained does not mean he or she committed the crime. It's just as important to free an innocent person from suspicion as to identify a guilty person. Do not talk with any other witnesses about the identification." Sandhu and Kumar indicated they understood the admonishment.

Kumar could not identify the suspects. Sandhu identified defendant and Lash as the men who robbed him. During the trial he identified defendant as the gunman and Lash as the second robber.

Police also conducted a second in-field show up to see if Sandhu and Kumar could identify Ramsey. Sandhu and Kumar told officers Ramsey was not involved in the robbery.

Detective Morin testified as a gang expert at the trial. He said the North Side Gangster Crips (NSGC) was a gang with 194 documented members and common signs or symbols. The primary activities of NSGC included firearms violations, carjacking, car theft, robbery, narcotics sale, shootings, and murder. The detective testified about crimes committed by particular documented NSGC gang members, including defendant and Ramsey. NSGC gang members primarily wore the color blue.

Detective Morin opined that Ramsey was an active NSGC gang member on December 28. The opinion was based on Ramsey's prior association with documented NSGC gang members in NSGC territory, self admission, display of NSGC's gang color,

5

prior conviction for a gang related offense, and the facts of the current crimes. Detective Morin opined that defendant was also an active NSGC gang member on December 28. That opinion was based on self admission, use of the term "cuzz" during prior police contacts, association with documented NSGC gang members, graffiti by defendant, and defendant's prior crime. Detective Morin opined that the taking of the Pontiac, carjacking of the Camry, and December 28 robberies were committed in association with and for the benefit of a criminal street gang because the crimes were committed by NSGC gang members defendant and Lash.

Defendant testified at the trial. He denied involvement in the crimes against Sandhu and Kumar. He said he was asleep at home at 7:00 a.m. on December 28. Defendant's mother Tina Perez corroborated defendant's story.

Defendant said he asked Perez whether he could go with her when she was leaving their home and she said no. Perez left home at about 10:00 a.m., and she told defendant to stay at home. Defendant wanted to go to his friend Ramsey's house but did not have money for the bus. He asked his great grandmother Dorothy Ragonton for money and she refused, so he took cans to the recycling center which was near his home and used part of the money he received for the cans to take the bus to Ramsey's house. Ragonton's testimony corroborated defendant's story about taking cans to the recycling center.

Defendant testified he got on a bus to go to Ramsey's house shortly after noon. Defendant presented evidence of a receipt from a recycling center with the time 11:18 a.m., and a bus pass that was issued at 12:04 p.m. by a bus driver on December 28. The bus pass was among defendant's personal possessions when he was booked at Juvenile Hall.

Ramsey lived on the same street where police found Kumar's Camry. Defendant said he played a video game at Ramsey's house and Lash subsequently arrived driving Sanchez's Pontiac.

6

Defendant knew Lash did not own a car and did not have a driver's license. Defendant claimed he had never seen the Pontiac before and he did not ask where Lash got the car. Defendant maintained that he did not know the Pontiac was a stolen car. Defendant believed Lash used a key to start the car.

Defendant, Ramsey, and Ramsey's girlfriend got in the Pontiac. They were going to drop off Ramsey's girlfriend at her house. Lash drove. Defendant sat in the front passenger seat. Ramsey and his girlfriend sat in the back seat.

Lash stopped at a liquor store to buy cigarettes. Everyone else stayed in the car. Lash then drove to Ramsey's girlfriend's house and dropped her off. Lash next drove to another location, where he got out of the car and went alone into a house. He returned to the car with marijuana. Lash then drove around and to the park.

Defendant saw some girls at the park. He told Lash to go back to the park because he wanted to talk to the girls. Lash complied. Defendant talked to the girls. He got out of the car and ran into the park because he allegedly did not know the men at the park were police officers.

Defendant admitted he was an NSGC gang member on the date of the charged offenses. He had been an NSGC gang member at least since he was 13 years old. Defendant was 17 years old on December 28. Defendant admitted he committed grand theft from a person (§ 487, subd. (c)) on October 8, 2009, and was adjudicated of grand theft of property from another.

Lash testified at the trial. He admitted he knew the Pontiac was stolen. He claimed he got the Pontiac from his brother Willie White. Lash admitted he ran from the police on December 28 because he knew the Pontiac was stolen.

Lash said he drove the Pontiac to Hayward with White and Ramsey on December 27. Lash returned home at about 2:00 a.m. on December 28 and went to sleep after making some telephone calls. He said he was asleep at 7:00 a.m. on December 28. He denied that he committed the robberies and carjacking of Sandhu and Kumar.

7

He denied that he was with defendant at 7:00 a.m. on December 28. Lash's mother Shantell Harrell corroborated Lash's account that he was at home asleep between 7:30 and 8:00 a.m.

Lash said he awoke at around 10:00 a.m. on December 28 and drove to his father's house in the Pontiac, which White had dropped off to Lash that morning. Lash's sister Shantian Lowe testified that Lash left home at around 10:00 a.m. Lash had the keys to the Pontiac. He picked up the rupee notes and coin that Kumar identified as belonging to him from the driver's side floor of the Pontiac and put the Indian currency in his pocket.

Lash said he visited with his father for about 30 minutes and then drove to Ramsey's house because Ramsey called Lash to ask Lash for a ride. Lash's father Joseph Quarles testified that Lash visited his home in Stockton at about 11:30 a.m., and Lash was driving a silver Pontiac.

Defendant, Ramsey, and Ramsey's girlfriend got in the Pontiac. According to Lash, defendant did not ask Lash about the Pontiac. The group went to a gas station where Lash bought cigarettes. Lash then drove to the house of Ramsey's girlfriend to drop her off. Lash drove the Pontiac to Cortez Park. He ran from the police.

Lash admitted his fingerprint was found on the medication bottle Sandhu testified was taken from his truck. But Lash denied knowing there was stolen property in the trunk of the Pontiac. He said he never looked in the trunk of the Pontiac.

The jury convicted defendant of unauthorized driving or taking of the Pontiac (Veh. Code, § 10851, subd. (a) -- count 7),[2] criminal street gang activity (Pen. Code, § 186.22, subd. (a) -- count 12), and misdemeanor resisting, obstructing, or delaying a peace officer (Pen. Code, § 148 -- count 13). The jury found that defendant committed the crime of unauthorized driving or taking of the Pontiac for the benefit of, at the

---

[2] Undesignated statutory references are to the Vehicle Code.

direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. The jury acquitted defendant of the crime of receiving stolen property, namely the Pontiac (Pen. Code, § 496d, subd. (a) -- count 8).

The jury could not reach a verdict and the trial court declared a mistrial on the counts against defendant for carjacking of the Camry (Pen. Code, § 215, subd. (a) -- count 1), assault with a firearm against Sandhu (Pen. Code, § 245, subd. (a)(2) -- count 2), second degree robbery of Sandhu (Pen. Code, § 211 -- count 4), unauthorized driving or taking of the Camry (§ 10851, subd. (a) -- count 5), receiving stolen property, namely the Camry (Pen. Code, § 496d, subd. (a) -- count 6), and receiving known stolen property, namely Sandhu's property (Pen. Code, § 496, subd. (a) -- count 11).[3]

The People retried defendant. The second jury also could not reach a verdict, and the trial court declared a mistrial as to counts 1, 2, and 4.

---

[3] The jury convicted Lash on counts 1 (carjacking of the Camry), 4 (second degree robbery of Sandhu), 5 (unauthorized driving or taking of the Camry), 7 (unauthorized driving or taking of the Pontiac), 10 (receiving stolen property, Kumar's Indian money) and 13 (resisting, obstructing, or delaying a peace officer). The jury found true the allegation that Lash committed the crimes alleged in counts 1, 4, 5, 7 and 10 for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. The jury also found true the allegation that Lash was armed with a firearm during the commission of the offenses charged in counts 1 and 4. The jury acquitted Lash on counts 6 (receiving stolen property, the Camry), 8 (receiving stolen property, the Pontiac) and 11 (receiving stolen property, Sandhu's property). The People dismissed the count 3 charge against Lash (assault with a firearm against Kumar).

The jury found Ramsey guilty on counts 7, 9 (receiving stolen property, Kumar's sunglasses), 12 (criminal street gang activity) and 13. The jury found true the allegation that Ramsey committed the crimes alleged in counts 7 and 9 for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. The jury acquitted Ramsey on counts 8 and 11.

The trial court sentenced defendant to an aggregate prison term of seven years.[4]  It dismissed the count 1, 2, 4, 5, 6 and 11 charges upon the People's motion.

DISCUSSION

I

Defendant challenges the sufficiency of the evidence that he aided and abetted the unauthorized driving or taking of the Pontiac.  He claims he was merely a passenger in the Pontiac, and there is no evidence that he knew Lash stole the Pontiac or that defendant did some act of aiding and abetting with the intent of furthering the unlawful purpose of Lash.  Defendant says his mere presence in the Pontiac and flight from the police are not enough to create aider and abettor liability.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.  [Citation.]  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)  We do not reweigh evidence or reevaluate a witness's credibility.  (*Ibid.*)  The effect of this standard of review is that a defendant challenging

---

[4]  The trial court sentenced Ramsey to an aggregate prison term of nine years four months.  Lash received an aggregate determinate sentence of 17 years 8 months, plus an indeterminate sentence of 15 years to life in prison.

10

the sufficiency of the evidence to support his conviction bears a heavy burden on appeal. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)

A person violates section 10851, subdivision (a) by driving or taking a vehicle not his or her own, without the consent of the owner thereof, and with intent to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle or by being a party or an accessory to or an accomplice in the driving, unauthorized taking, or stealing. (§ 10851, subd. (a).) A passenger can be convicted of violating section 10851, subdivision (a) where he or she possessed the stolen vehicle under suspicious circumstances. (*People v. Miles* (1969) 272 Cal.App.2d 212, 218 (*Miles*).) The passenger of a stolen vehicle has constructive possession of the vehicle (i.e., the capacity to exert control or dominion over it) when he or she is present in the stolen vehicle and he or she knows the driver, knows that the vehicle was stolen, and intends to use the vehicle for his or her own benefit and enjoyment. (*People v. Land* (1994) 30 Cal.App.4th 220, 227-228.)

The prosecution in this case relied on an aiding and abetting theory. A person aids and abets the commission of a crime when (a) the direct perpetrator commits a crime, (b) the aider and abettor knows of the perpetrator's criminal purpose, (c) the aider and abettor intends to commit, encourage, or facilitate the perpetrator's commission of the crime, and (d) by act or advice, the aider and abettor aids, promotes, encourages, or instigates the commission of the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*); *People v. Beeman* (1984) 35 Cal.3d 547, 560-561 (*Beeman*).) Whether a defendant aided and abetted the commission of a crime is a question of fact which may be proved by circumstantial evidence. (*Beeman*, at pp. 559-560; *People v. Pitts* (1990) 223 Cal.App.3d 606, 892-893.)

Lash drove the Pontiac without Sanchez's permission the day after the car was taken from Sanchez's apartment complex and on December 28, when police saw the car.

11

Defendant was a passenger in the stolen Pontiac on December 28. Defendant denied that he knew the Pontiac was a stolen car. Being a mere passenger in a stolen car does not constitute being " 'a party or an accessory to or an accomplice in the driving' " or unauthorized taking or stealing of a motor vehicle. (*People v. Clark* (1967) 251 Cal.App.2d 868, 874 (*Clark*).) But there was substantial evidence from which the jury could reasonably find that defendant knew Lash was driving a stolen car with the intent to permanently or temporarily deprive the owner of title or possession of the car; that defendant intended to encourage Lash's commission of the crime; and that defendant did in fact promote or encourage the commission of the crime.

Unlike the situation in *Clark, supra*, 251 Cal.App.2d 868, a case upon which defendant relies, defendant and Lash (the driver of the stolen Pontiac) had a close relationship. (*Clark, supra*, 251 Cal.App.2d at p. 872-874 [the driver of the stolen car was a friend of the person with whom the defendant attended a party; the driver offered the defendant a ride home when the person with whom the defendant arrived left the party without him].) Defendant had known Lash since the two were in middle school. He saw Lash about two or three times a week. The two visited each other's homes. Defendant knew Lash did not have a car. Lash was 17 years old. He did not have a job. Defendant saw Lash driving a nice car, the Pontiac, on December 28. Defendant had never seen the Pontiac before.

Defendant and Lash were also NSGC gang members. Defendant knew NSGC gang members engaged in criminal gang activities. The primary activities of the NSGC included car theft. According to Detective Morin, gang members often bragged to their "homies" about their crimes and gang members were expected to have "the back of" a fellow gang member. Detective Morin testified that the NSGC gang benefitted from the possession of a stolen vehicle by an NSGC gang member because the gang could use the stolen car, which could not be traced back to the gang member, to commit other crimes and gang members could use the stolen car to associate with fellow gang members. Lash

12

admitted he knew the Pontiac was stolen and he drove the Pontiac on December 27 and 28. Lash used the Pontiac to commit the December 28 crimes against Sandhu and Kumar. The jury found Lash committed the December 28 crimes in association with or for the benefit of the NSGC gang.

The jury was not required to credit defendant's testimony that he did not know the Pontiac was stolen. Even if defendant did not ask Lash where Lash got the Pontiac, the jury could reasonably conclude that defendant knew the Pontiac was stolen based on defendant's testimony, Detective Morin's opinion that Lash was an NSGC gang member, and Morin's testimony about the NSGC gang and its members.

Defendant asserts that gang evidence cannot be used to show a defendant's criminal disposition or bad character as a means of creating an inference that the defendant committed the charged offense. While that may be correct (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449 [citing Evidence Code section 1101]), gang evidence is admissible when it is relevant to non-character issues such as knowledge. (Evid. Code, § 1101, subd. (b).) Here, the trial court instructed the jury on the limited use of gang evidence. The trial court told the jury that it may not use gang evidence to conclude that the defendant was a person of bad character or that he had a disposition to commit crime.

Defendant further argues the fact that the jury found him not guilty of the count 8 charge of receiving a stolen motor vehicle with knowledge that the vehicle was stolen (Pen. Code, § 496d) shows that the jury did not find that defendant knew the Pontiac was a stolen vehicle. Not so. The trial court instructed the jury that counts 7 and 8 were charged as alternative offenses. The trial court told the jury that if it found any defendant guilty of count 7, it must find that defendant not guilty of count 8. The jury found defendant guilty on count 7. It could not find defendant guilty on count 8. The count 8 acquittal does not indicate the jury found defendant did not know the Pontiac was a stolen car.

13

There was also substantial evidence from which the jury could reasonably find defendant had constructive possession of the Pontiac. Defendant rode in the Pontiac on December 28 with fellow NSGC gang members, just two days after the car had been stolen. Defendant remained in the Pontiac as Lash made various stops. Unlike the defendant in *Clark*, there is no evidence in this case that defendant could not have left the Pontiac after he knew the car was stolen. (*Clark, supra*, 251 Cal.App.2d at p. 874.) Defendant had an all-day bus pass. Lash left defendant and Ramsey in the car when he stopped to buy cigarettes and then marijuana. Defendant did more than sit in the Pontiac, he asked Lash to return to Cortez Park so defendant could talk to some girls and Lash complied. Although defendant did not drive the Pontiac, the jury could reasonably find from defendant's testimony, Detective Morin's expert opinion, the presence of three NSGC gang members in the stolen Pontiac, and the compliance with defendant's request to drive to the park that defendant shared the intent to deprive the owner of the Pontiac of possession of the car and that defendant intended to and did promote or encourage Lash's continued unauthorized driving or taking of the Pontiac.

Moreover, there is evidence of flight. Lash ran from the police because he knew the Pontiac was stolen. Defendant claimed he did not know Detective Nesbitt and Investigator Benatar were police officers when he ran from them, but the officers shouted "police." Defendant ran from the Pontiac, ignoring the officers' commands. Evidence of flight supports an inference of consciousness of guilt. (*People v. Brooks* (1966) 64 Cal.2d 130, 138.) Knowledge that a vehicle is stolen and flight upon detection evince a specific intent to deprive the owner of possession of her car. (*People v. Green* (1995) 34 Cal.App.4th 165, 180-182; *In re Robert V.* (1982) 132 Cal.App.3d 815, 821; *Miles, supra*, 272 Cal.App.2d at p. 218.)

There is evidence from which the jury could reasonably find that defendant was not merely a passenger in the Pontiac, that he knew the Pontiac was stolen, and that he

aided and abetted Lash in the unauthorized driving or taking of the Pontiac. We reject defendant's insufficiency of the evidence claim.

## II

Defendant also contends the former version of CALCRIM No. 400 with which the trial court instructed the jury incorrectly suggested that if the jury found Lash guilty, it must also find defendant guilty.

Because an aider and abettor's culpability depends on his own mental state, in certain circumstances an aider and abettor may be guilty of a greater or lesser crime than the direct perpetrator. (*McCoy, supra*, 25 Cal.4th at p. 1120; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118 (*Lopez*), disapproved on another ground in *People v. Banks* (2015) 61 Cal.4th 788, 809, fn. 8.) Accordingly, the last sentence of CALCRIM No. 400 was revised in April 2010 to delete the phrase "equally guilty" so that it now reads, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.)

The trial court here instructed the jury in January 2013, but used the former version of CALCRIM No. 400. The trial court told the jury, "a person may be guilty of a crime in two ways. 1. He or she may have directly committed the crime. I will call that person the perpetrator. [¶] 2. He or she may have aided and abetted a perpetrator who direct [*sic*] committed the crime. [¶] A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."

Nevertheless, the statement that " '[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it' " is a generally correct statement of law. (*Lopez, supra,* 198 Cal.App.4th at p. 1118; *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [referring to CALJIC No. 3.00 which also contains the "equally guilty" language]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165.) Defendant forfeited his instructional error claim because the CALCRIM No. 400 instruction given was generally accurate and defendant did not

15

request a modification of the instruction at trial. (*Mejia, supra,* 211 Cal.App.4th at p. 624; *Lopez, supra*, 198 Cal.App.4th at pp. 1118-1119; *Samaniego, supra,* 172 Cal.App.4th at p. 1163.) The claim also fails on the merits.

An aider and abettor's guilt is determined by the combined acts of all the participants in the crime and the aider and abettor's mens rea. (*McCoy, supra,* 25 Cal.4th at p. 1122.) As we have explained, a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime. (*Id.* at p. 1117-1118; *Beeman, supra,* 35 Cal.3d at pp. 560-561.)

The trial court told the jury to consider the evidence as it applied to each defendant and that the jury must decide each charge for each defendant separately. With regard to the count 7 charge of unauthorized driving or taking of the Pontiac, the trial court said in order to find a defendant guilty of that offense, the jury must find the defendant intentionally committed the prohibited act and possessed the specific intent set forth in the instruction for the crime. The trial court instructed the jury on the specific intent for the crime of unauthorized driving or taking of a motor vehicle. The trial court further told the jury that a person may be guilty of a crime if he aided and abetted a direct perpetrator who committed the crime. The trial court instructed the jury on the specific intent and conduct necessary for aiding and abetting liability pursuant to CALCRIM No. 401. The trial court said to prove a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that the perpetrator committed the crime; that defendant knew that the perpetrator intended to commit the crime; that before or during the commission of the crime, defendant intended to aid and abet the perpetrator in committing the crime; and that defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. The trial court stated that someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends

16

to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.

In assessing a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) Considered together, the instructions given made clear the prosecution was required to establish a defendant's individual culpability, and the jury had to examine defendant's own acts and mental state in order to decide whether, under CALCRIM No. 401, he is liable as an aider and abettor. The jury could not have reasonably understood the instructions to say that defendant's culpability as an aider and abettor was "automatic" if the jurors found Lash guilty. There is no indication the jury was confused about the aiding and abetting instructions. (Contra, *People v. Loza* (2012) 207 Cal.App.4th 332, 354-355; *People v. Nero* (2010) 181 Cal.App.4th 504, 518.) We must assume that jurors are intelligent persons capable of understanding and correlating the jury instructions, and that they followed the trial court's instructions. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028; *People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*).)

Defendant also raises a related prosecutorial misconduct claim. He says we should consider the merits of his prosecutorial misconduct claim even though he did not object in the trial court because the error is of constitutional dimension, there is no conceivable tactical reason for his trial counsel's failure to object, and a merits review would forestall a claim of ineffective assistance of counsel.

Defendant forfeited his claim of prosecutorial misconduct by failing to object to the challenged statements at trial and failing to request an admonishment to the jury. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) Failure to object and to request an admonition does not result in forfeiture where the prosecutor's misconduct is of such a character that a timely admonition to the jury

17

could not cure the error caused by the misconduct. (*People v. Kirkes* (1952) 39 Cal.2d 719, 726.) But defendant does not contend that a timely admonition to the jury would have been futile in this case. In any event, defendant's claim of prosecutorial misconduct also fails on the merits.

Defendant claims the prosecutor misstated the law by telling the jury that an aider and abettor "steps into the shoes" of the perpetrator and adopts the acts of the perpetrator, thereby overcoming the lack of evidence that defendant performed any acts which constitute aiding and abetting of the unauthorized driving or taking of the Pontiac.

An aider and abettor's guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and mental state. (*McCoy, supra*, 25 Cal.4th at p. 1117.) As the California Supreme Court explained, " 'When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense . . . are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the . . . intent of the actual perpetrator. [¶] Aider and abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, she says in essence, "your acts are my acts . . ." ' [Citations.] But that person's own acts are also her acts for which she is also liable. Moreover, that person's mental state is her own; she is liable for her mens rea, not the other person's." (*McCoy, supra*, 25 Cal.4th at pp. 1118, italics omitted.)

We must view the challenged statements by the prosecutor in the context of the argument as a whole. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) The prosecutor told the jury a defendant can be guilty as an aider and abettor by advising, promoting or

18

encouraging the commission of a crime. She said, "when an accomplice chooses to go ahead and become part of the criminal activity of someone else, they're saying your acts are my acts, I'm stepping into your shoes. And that defendant forfeits his personal identity. The aider and the abettor is as guilty as the principal." She argued that defendant and Lash used the stolen Pontiac to commit the carjacking and robbery of Sandhu and Kumar. And defendant knew the Pontiac was stolen. The prosecutor said concerning the count 7 charge of unauthorized driving or taking, "let's think about aiding and abetting here. Your acts are my acts. You can infer, if you look at what the defendants are doing, they're acting together. They're in this car together, that they all are acting together, driving or taking this Pontiac together. And so that's what the aiding and abetting is all about. So you can find all three of them guilty of driving or taking the Pontiac. [¶] . . . [¶] [U]nder the aiding and abetting you look at what these defendants are doing. They are driving around in the car. They have the stolen property in the car. You have defendant Ramsey having the sunglasses. You have defendant Lash and Burton in that car and all that property in the trunk that was from the carjacking. So they're -- basically what's happening is the loot has been disseminated."

Defendant's trial counsel recited the elements of the crime of unauthorized driving or taking in his closing remarks to the jury. He argued the jury cannot convict defendant of unauthorized driving or taking of the Pontiac because defendant did not steal or drive the Pontiac. He said defendant did not know the Pontiac was stolen, and all defendant did was accept a ride in the Pontiac.

The prosecutor argued in rebuttal that defendant knew the Pontiac was stolen. She reiterated that defendant and Lash used the Pontiac to commit the carjacking and robbery of Sandhu and Kumar. And defendant and Lash drove around with Sandhu and Kumar's property in the trunk of the Pontiac. The prosecutor said defendant and Ramsey "were supporting and also in possession of" the Pontiac. She said it did not matter who stole the

19

Pontiac.  What mattered was who drove it and who had possession and control of the Pontiac on December 28.

Viewing the entirety of the closing statements, the prosecutor's "your acts are my acts" statements did not misstate the law.  (*McCoy, supra*, 25 Cal.4th at pp. 1118-1120.)  While the prosecutor did not recite the aiding and abetting requirements set forth in CALCRIM No. 401, she did not tell the jury it did not have to consider defendant's own actions to decide whether aiding and abetting liability attaches.  The prosecutor did not say defendant was an aider and abettor merely because he was present in the Pontiac.  Rather, the prosecutor argued that, acting together and with knowledge that the Pontiac was a stolen vehicle, defendant and Lash used the Pontiac to rob Sandhu and Kumar and to take away Sandhu and Kumar's property.  The prosecutor said defendant was in possession of the Pontiac, and defendant supported the unauthorized driving or taking of the Pontiac.  This was not improper argument.  We reject defendant's claim of prosecutorial misconduct.

Moreover, the trial court instructed the jury to follow its instructions on the law where the jury believed the attorneys' comments on the law conflicted with the court's instructions.  As we have explained, the trial court correctly instructed the jury on the requisite findings for aiding and abetting liability.  The trial court repeated the CALCRIM No. 401 instruction, which listed the aiding and abetting requirements, after the prosecutor's rebuttal closing statement.  The trial court told the jury mere presence at the scene of the crime, by itself, is insufficient to make a defendant an aider and abettor.  We assume the jury followed the trial court's instructions.  (*Sanchez, supra,* 26 Cal.4th at p. 852.)  Additionally, defendant's trial counsel reviewed the CALCRIM No. 401 instruction with the jury during his closing statement.

Defendant fails to establish reversible error.  We do not consider defendant's alternative ineffective assistance of counsel claim.

## III

Defendant contends that if we reverse the judgment as to the unauthorized driving or taking of the Pontiac (count 7), we must also reverse the judgment as to count 12 (promoting felonious gang conduct), because count 12 is based on the count 7 felony conviction. We need not address this contention because we have determined that defendant's challenges to the conviction for unauthorized driving or taking the Pontiac lack merit.

## DISPOSITION

The judgment is affirmed.

                                               /S/
                                        MAURO, J.

We concur:

/S/
BLEASE, Acting P. J.

/S/
ROBIE, J.